Filed 8/4/14

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, )
)
    Plaintiff and Respondent, )
)         S067394
    v. )
)
JOHN LEO CAPISTRANO, )
)     Los Angeles County
    Defendant and Appellant. )   Super. Ct. No. KA034540
_____ )

Defendant John Leo Capistrano was convicted at trial of one count of first degree murder (Pen. Code, § 187),[1] one count of attempted willful, premeditated murder (§§ 664, subd. (a), 187, subd. (a)), six counts of first degree robbery (§§ 211, 212.5, subd. (a), 213, subd. (a)(1)(A) & (B)), three counts of carjacking (§ 215), one count of first degree burglary (§ 459), two counts of rape in concert (§§ 261, subd. (2), 264.1) and two counts of forcible oral copulation in concert (§ 288a, subd. (a) & (d)), arising from four separate incidents involving six victims.[2] The first incident, on December 9, 1995, involved the murder and robbery of Koen Witters, who was found in his Rowland Heights apartment strangled and with his wrists cut. The second incident, on December 15, 1995, in the City of Whittier, involved the carjacking and home invasion robbery of J.S. and her husband, E.G., and the commission of the rape and forcible oral copulation

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Defendant was tried with his codefendant, Michael Drebert, before separate juries.

of J.S. during that robbery.  The third incident, on December 23, 1995, in the City of West Covina, involved the carjacking and home invasion robbery of Ruth and Patrick Weir.  The fourth incident, on January 19, 1996, involved the home invasion robbery and attempted murder of Michael Martinez, who was found in his apartment in West Covina having been beaten on the head with a baseball bat and with his throat cut.

As to the murder of Koen Witters, the jury found true the two special circumstance allegations that the killing was committed in the course of a burglary and a robbery (§ 190.2, subd. (a)(17)(A), (G)).  The jury also found defendant personally used a firearm (§ 12022.5, subd. (a)), and a principal was armed with a firearm (§ 12022, subd. (a)(1)) in the commission of the crimes against J.S. and E.G., and the Weirs.  As to the crimes against Michael Martinez, the jury found defendant personally used a deadly and dangerous weapon (§ 12022, subd. (b)), and personally inflicted great bodily injury (§ 12022.7, subd. (a)).  After a penalty trial, the jury returned a verdict of death.  The trial court denied the automatic application to modify the verdict (§ 190.4, subd. (e)), and sentenced defendant to death.  As to the noncapital offenses, the court sentenced defendant to consecutive indeterminate terms of life plus four years' imprisonment for the Martinez attempted murder and 25 years to life plus 10 years' imprisonment for the rape of J.S., and to various determinate terms on the remaining counts.  This appeal is automatic.  (§ 1239, subd. (b).)  We will order the trial court to correct the abstract of the judgment in one respect and otherwise affirm the judgment.

## I. FACTS

### A. Guilt Phase

#### 1. Prosecution Evidence

##### a. Defendant and His Associates

Defendant was 25 years old when the instant offenses occurred between December 9, 1995, and January 19, 1996.  He lived with his cousins Jessica and Joanne Rodriguez

at the Lido Garden Apartments in West Covina. Jessica Rodriguez had formerly lived at the Pheasant Ridge apartment complex with her mother. Defendant had helped Rodriguez's mother move out of the Pheasant Ridge apartments in November 1995. Koen Witters, the murder victim, also lived in the Pheasant Ridge complex.

Defendant was regularly in the company of three youths, Michael Drebert, Eric Pritchard and Anthony Jason Vera. Drebert and Pritchard called defendant "Dad." Gladys Santos, a key prosecution witness, met defendant in October 1995. Santos also knew Drebert, Pritchard and Vera. Between December 1995 and January 1996, she saw defendant, Drebert and Pritchard regularly, and Vera less so. One reason she saw defendant so frequently during this period was because she was taking care of a 12-year-old girl, Justine, whom defendant treated as his daughter, although he was not her father.

*b. The Murder of Koen Witters on December 9, 1995*

Koen Witters was in California as part of his work for a Taiwan-based company called Free Free Industrial Corporation. He lived in a company-leased apartment in the Pheasant Ridge apartment complex. Witters was scheduled to return to Taiwan on the night of December 9, 1995. His coworker, Sheree Chen, dropped him off at his apartment at 4:00 p.m. Chen arranged to return later that evening to collect Witters's apartment key and company-owned cellphone. When she returned at about 9:30 p.m., Witters did not respond to her knocking at the door and calling his name. The airport shuttle driver arrived and also tried knocking. When there was no response, he tried the door and found it unlocked. He and Chen entered the apartment. The apartment was "a mess," according to Chen. The driver looked into the bedroom and got Chen out of the apartment, telling her, "He's dead, he's dead." They called 911 from the complex's security office.

Police found Witters lying facedown on the bedroom floor, clad only in a pair of swim trunks. His feet were tied at his ankles with a pair of athletic socks. His hands were tied behind his back at his wrists with athletic socks and videotape. His mouth was

3

gagged with another athletic sock secured by a plastic bag. There were large cuts to his forearms and a black luggage strap around his neck. In the living room police found a black flight bag missing its strap. A steak knife was found wedged between the mattress and the box springs in the bedroom. The medical examiner determined that strangulation was the cause of death.

Witters's apartment had been ransacked. A suitcase on the bed had been forced open and its contents strewn on and around the bed. Missing from the apartment was an Apple computer, a videocassette player (VCR) and the company's cellphone.

Just before Christmas that year, Michael Drebert told Gladys Santos he, defendant and Pritchard had robbed Witters and that defendant had murdered him. Following this conversation, Santos asked defendant if it was true that he had "kill[ed] someone with a belt?"[3] Defendant laughed and said, ". . . Mike told you, huh?" Santos denied Drebert had told her and again asked him if it was true. Defendant said, "Yeah." Although at first unwilling to talk about the murder, defendant eventually admitting killing Witters, even demonstrating how he had strangled the victim.

Defendant told Santos that he, Drebert and Pritchard had been "scoping" out Witters's apartment to rob it. Defendant told her he killed Witters because Witters saw him without a mask. He strangled rather than shot him because a gun would have been too loud and "shanked" Witters because Witters "wouldn't die." In a later conversation, he told her he had asked Drebert to help him strangle Witters, and he strangled the victim

---

**3** As noted, defendant and Drebert were tried simultaneously before different juries to avoid *Aranda/Bruton* issues. (*People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. United States* (1968) 391 U.S. 123.) (See *post*, pt. II.C.2.) When Santos testified before defendant's jury—Drebert's jury having been excused from the courtroom—she did not use Drebert's name but testified only that she had a conversation with someone other than a police officer who claimed to have been present at a murder. She testified further that after this conversation, she then had the conversation with defendant, who revealed the details of the murder.

three times before cutting him. Santos testified further that after the Witters murder, defendant asked her if she knew anyone who might want a large computer. She also testified that after defendant was arrested he told her that if she talked to the police, he would kill her children.

*c. Robbery and Sexual Assault Offenses Involving J.S. and E.G. on December 15, 1995*

About 9:30 p.m. on December 15, 1995, J.S. and her husband, E.G., returned to their Whittier home after visiting E.G.'s family. E.G. pulled into the garage and got out while J.S. remained in the passenger seat. A man inside the garage wearing a ski mask pointed a gun at E.G.'s face and said, "Give me your money." J.S. heard her husband yell and saw a man with his hand outstretched toward her husband. A second man was standing behind the first one. One of the men came over to her, pointed a gun at her and motioned to her to get out of the car. One of the men told her husband, "We're gonna go in the house."

The men led J.S. and E.G. into the master bedroom and tied their wrists behind their backs. The men also used belts and ties to bind the victims' ankles and knees, then laid them on the bed. Two other men joined the two men who had brought them into the house. All the men wore gloves and their faces were covered; two of them carried guns. Despite their masks, J.S. later identified two of the men from police lineups as Eric Pritchard and Anthony Jason Vera. The man who appeared to be the leader of the group was over six feet tall and had a "good build." At trial, a police detective testified that defendant is six feet four inches tall and weighs 210 pounds. (The fourth man was not identified at trial.)

One of the men asked J.S. if they had children, were expecting anyone or owned firearms, and what their neighbors were like. Two of the men, including Pritchard, put guns to the victims' heads and repeatedly asked, "Where's the money?" The men

rummaged through the dresser and the closet in the bedroom, and J.S. heard doors and boxes being opened elsewhere in the house.

One of the men removed a bullet from his gun, put it on the bed between the victims and asked, "Isn't it big?" Two of the men, one of them Pritchard, asked both J.S. and E.G. if they would "suck dick" to save their lives.

The tall man who appeared to be the leader eventually took J.S. into the bathroom where he twice forced her to orally copulate him and then twice raped her. The second time he ejaculated into her. Afterwards, he took her into a second bedroom where Pritchard also forced her to orally copulate him. After Pritchard left, a man with a gun came in and stood guard. The tall man came in and out of the room. He pulled down J.S.'s pants, fondled her buttocks and made sexual comments about her husband. At one point, after ascertaining that J.S. was of Mexican descent, he told her that he would not kill her because she was Mexican. E.G., meanwhile, remained tied up in the master bedroom. Eventually the men left and the victims were able to free themselves and call 911.

The victims' home was ransacked. The robbers took stereo equipment, a VCR, two telephone answering machines, jewelry, small appliances and a Scepter brand laptop computer, among other items. They also took the victims' 1989 Honda Accord.

J.S. was taken to a hospital where a sexual assault examination was conducted; oral and vaginal swabs were taken and later subjected to DNA testing.

Blood samples were obtained from J.S., defendant, Drebert, Pritchard and Vera, and also subjected to DNA testing. Testing performed on the vaginal swab indicated that defendant's blood sample was consistent with sperm from the vaginal swab.[4] Gladys

---

[4] Defendant refused to provide a blood sample voluntarily, and it had to be obtained by a court order. Similarly defendant refused to participate in the series of lineups at

*(footnote continued on next page)*

6

Santos testified that defendant brought to her house an answering machine and laptop computer matching the description of the computer stolen from J.S. and E.G. Drebert later removed the computer from Santos's apartment. After defendant's arrest, Santos gave police an answering machine with the same serial number as one of the machines stolen from J.S. and E.G.

### d. The Weir Robbery on December 23, 1995

About 5:30 p.m. on December 23, 1995, Ruth Weir arrived at her Conlon Street home in West Covina after grocery shopping. She pulled into her garage, which was detached from her house, and took groceries from the trunk into her house. When she returned to the garage she was accosted by two men wearing ski masks, one of them armed with a gun. The armed man told her to go into the house. Once inside, the men asked her if she was expecting anyone and asked about her neighbors. She told them she was expecting her husband. She heard her husband's car pull into the driveway. She glanced out the window and saw a third man standing in the backyard.

One of the men told her to go into the dining room and lie down on the floor. She complied. She heard her husband, Patrick, come in the house and say something like, "What's going on?" She was taken from the dining room to the family room, where her husband was lying facedown on the floor. There were three intruders in the room; two of them wore ski masks while the third concealed his face by lifting his coat over it. One of them told her to lie down next to her husband. While one of the men sat on the couch with a knife, the others brought wrapped Christmas presents into the room. One of the men asked her if she had money and, when she said, "No," threatened to kill her if money

_____

*(footnote continued from previous page)*

which J.S. identified Pritchard and Vera. He was ordered to participate at a later lineup, but J.S. did not identify him.

was discovered. Another one found her senior citizen volunteer badge for the West Covina Police Department and asked her where she kept her gun. She explained she was not a police officer but only a volunteer. One of the men went through her pockets and her husband's pockets while another asked her where she kept her car keys and then took them. The men also took the Christmas packages. When she protested, one of them put a gun to her head and said, "Would you rather have your Christmas gifts or your life?"

Angela Phillipson, a neighbor of the Weirs, saw an older two-toned beige four-door American-model car and Ruth Weir's Taurus parked on the nearby cross-street. The Taurus drove away quickly while the other car drove away at a normal speed. She later saw the same two-toned car in the vicinity of the Weirs' home after the police had arrived.

After the robbers left, Ruth Weir called 911. When the police arrived, she inspected her house and found numerous items missing in addition to her Christmas presents. These included jewelry, cash and two sets of three ceramic angels. Her Taurus and a Ziploc bag containing commemorative coins were also missing.

The police found the Taurus the next day in the parking lot of an auto parts store near where Gladys Santos lived. The car's stereo had been taken.

Santos testified that on the day of the Weir robbery, defendant called her and asked her to pick him up at a location near where he was staying. When she did, and she asked him what he had been doing, he said, "Well, we just robbed somebody." He had her drive by a house in West Covina and told her a police officer lived there. He said he had stolen Christmas presents, a white car, and groceries. He directed her to another location where he said he had hidden some coins. He got out of the car, but when he returned he told her there was nothing there. Defendant brought some jewelry to Santos's apartment, which Santos later gave to the police. The jewelry belonged to Ruth Weir.

On January 6, 1996, police stopped a beige-and-brown Buick being driven by defendant's cousin, Jessica Rodriguez. Drebert and Vera were passengers.[5] The car was impounded and searched. In it, police found three ski masks, a pair of cotton gloves, and three knit gloves.

*e. The Attempted Murder of Mike Martinez on January 19, 1996*

In January 1996, Mike Martinez lived in Lido Garden Apartments, the same apartment complex as did defendant's cousins, Joanne and Jessica Rodriguez, with whom defendant, Drebert, Pritchard and Vera were staying. Also living with Martinez was Amy Benson, the pregnant daughter of a friend. Defendant and his confederates "hung out" with Benson at Martinez's apartment almost every day. The owner of the apartment building told Martinez that if defendant and his friends continued to come to his apartment, he would be evicted. In late December or early January, Martinez told Benson and defendant that defendant and his friends could no longer come to Martinez's apartment. They ignored him. Martinez did not say anything more to defendant, whom he believed to be a gang member, because he was afraid of him.

On January 13, 1996, Eric Pritchard was detained by police investigating a report of a suspicious person loitering at the apartment complex. Martinez saw the detention take place. Pritchard was taken into custody because he had been reported as a runaway and was ultimately released into the custody of his mother.

Six days later, on January 19, Martinez returned home from work around 6:30 p.m. and ate dinner. He left the apartment for a while, returning around 8:00 p.m. to take

---

**5** In a bench conference before the testimony of the officer who detained Rodriguez, the prosecutor noted the car had been detained because it and the occupants matched the description of the vehicle involved and the people who had committed a series of street robberies in the City of Montebello. Neither Vera nor Drebert was charged with those robberies because the victims were unable to identify them. Consequently, the reason for the stop was not revealed to the juries in defendant's and Drebert's trial.

9

a shower. When he emerged from the bathroom, defendant, Pritchard, Drebert and Vera were in the apartment. Drebert and Vera were rummaging through Martinez's closet and desk. Someone had closed the curtains. In an angry and aggressive tone, defendant told Martinez to sit on the couch. Drebert locked the door.

Defendant accused Martinez of calling the police on Pritchard, which Martinez denied. Drebert held up a set of keys and asked Martinez which were the keys to his car. Martinez told him. He also noticed his pager, a watch and some change were missing from the top of the dresser. Defendant struck Martinez in the jaw with such force it tore his lower lip and knocked him backwards. He asked Martinez how much money he had in the apartment and, after Martinez told him a few hundred dollars, said he would kill Martinez if he found more.

Defendant told Drebert to get some belts from the closet. Defendant used them to bind Martinez's arms behind his back and to bind his legs. Martinez saw Drebert take a baseball bat out of the closet and hand it to defendant. Defendant placed a shirt or a towel over Martinez's head. He felt a blow to his head. The next thing he remembered was waking up in the hospital.

The officer who responded to a neighbor's 911 call found Martinez lying face up on the floor in a pool of blood, unconscious and gasping for air. Martinez's eyes were swollen shut and some of his teeth lay on the carpet beside him. A bloody bat was leaning against the couch. When the paramedics rolled Martinez onto his stomach, the officer saw puncture wounds on Martinez's back. A bloody screwdriver was found on the couch.

Martinez had surgical staples placed in his head, he lost some of his teeth, and he was treated for stab wounds to his back. The staples were removed after about a month. Martinez endured 12 root canals, the loss of his sense of smell and a 60 percent loss of hearing, which lasted for three months. Martinez identified defendant, Drebert, Vera and

10

Pritchard as his assailants from photographs. Martinez's vehicle was stolen but was recovered a few days later.

Defendant and his confederates went to Gladys Santos's apartment after the attack on Martinez. Defendant told Santos he had "played baseball" with Martinez's head. Two patrol officers who received a radio call about the assault on Martinez at the Lido Garden Apartments were told that a red Camaro spotted there three days earlier may have been involved. Their search for the car took them to the apartment complex where Santos lived, about a half-mile from the Lido Garden complex. Eric Pritchard was detained as he attempted to drive out of the complex in a red Camaro. Pritchard ultimately led the police to Santos's apartment, where defendant, Drebert and Vera were arrested. Santos was also arrested because she lied to the police about knowing Pritchard and about who was in her apartment. No charges, however, were filed against her. A subsequent search of Santos's apartment yielded several items belonging to Martinez.

### 2. *Defense Evidence*

The defense was one of mistaken identity. To that end, defendant introduced evidence to show that on various occasions he had been welcomed in Martinez's apartment and had socialized with Martinez. He also introduced evidence regarding the physical appearance of Eric Pritchard's brother, Willie, who was about the same height and build as defendant. Additionally, he offered evidence that a gun was found in the trunk of the car occupied by Joanne Rodriguez, Drebert, and Vera when police stopped them on January 6, 1996, introduced apparently to suggest Drebert and Vera could have committed the charged offenses without defendant's involvement. Finally, and evidently in response to J.S.'s testimony concerning her sexual assault, he introduced evidence regarding the length of his penis.

11

## B. Penalty Phase

### 1. Prosecution Evidence

At the penalty phase, the prosecution's evidence in aggravation consisted of the circumstances of the offenses of which defendant was convicted, defendant's prior felony convictions, and his violent criminal activity while in custody. (§ 190.3, factors (a)-(c).) The prosecution presented evidence of defendant's felony convictions for sale of marijuana and vehicle theft. The prosecution also presented evidence of four separate attacks by defendant on other jail inmates, three of which occurred while he was in custody on this case.

On June 4, 1994, defendant attacked Victor Rodela at the Los Angeles County jail apparently because he believed Rodela was homosexual. He kicked and punched Rodela. Rodela sustained a swollen and bloody upper lip and complained of pain to his jaw, back, ribs, and groin.

On October 4, 1996, defendant kicked Ricky Crayton in the mouth with sufficient force to break Crayton's jaw.

On February 18, 1997, defendant and another inmate stabbed Mauricio Gonzalez as Gonzalez was being transported to his cell with his hands cuffed behind his back and attached to a waist chain. In the opinion of the officer who testified as an expert on Hispanic prison gangs, defendant and the other inmate were carrying out a "hit" on Gonzalez ordered by the Mexican Mafia prison gang. Prior to the instant trial, defendant was convicted of attempted murder for his attack on Gonzalez.

On June 23, 1997, defendant attacked Raymond Gonzalez in the holding cell at the courthouse in Pomona evidently because he believed Gonzalez—a prosecution witness in another case—was a "snitch." Gonzalez sustained a golf-ball-size knot on his forehead, a bloody nose and blood on his lip and around his teeth.

In addition to this evidence, the prosecution introduced evidence that defendant mouthed the words "Get that fucker," to another inmate as defendant nodded toward

12

Drebert when they were all in court. As a result, Drebert's jail status was changed to K-10, meaning that he was kept away from all other inmates.

## 2. *Defense Evidence*

Defendant's girlfriend, Claudia Meza, testified she had known defendant for 11 years and had dated him from October 1995 to January 1996. According to Meza, defendant had never participated in gang activities, nor had he used drugs in Meza's presence. Defendant told Meza he had had a troubled life, had been in and out of jail, and no one had been there for him. Meza testified that defendant planned to change his life by getting a job as a certified nurse's assistant and having his tattoos removed.

Defendant's father, John Catani, also testified. Catani was in prison at the time he testified. He testified he had been in prison when defendant was born in 1970 and was incarcerated in 1976 and again from 1988 to 1990. He and defendant's mother were together from 1975 to 1990. They fought constantly and one or the other of them would often leave for extended periods. Catani had a drug problem and defendant's mother had a drinking problem. When defendant was 14 or 15 years old, Catani noticed his tattoos. Catani believed defendant joined a gang in his late teens. Catani had visited defendant when he was incarcerated in the California Youth Authority when he was 15 or 16, and had scolded him and warned him against becoming a gang member.

## II. DISCUSSION

### A. Assertedly Improper Joinder of Charges

Defendant argues the trial court abused its discretion when (1) it denied his request to sever the Martinez (home invasion robbery, attempted murder), Weir (home invasion robbery, carjacking) and J.S./E.G. (home invasion robbery, sex offenses, carjacking) charges from each other; and (2) when it joined those charges to the Witters capital charges, over his objection. We find no abuse of discretion.

13

### 1. *Denial of Defendant's Severance Motion*

On November 18, 1996, defendant moved to sever the Martinez, Weir and J.S./ E.G. cases, which had previously been joined by the trial court at the prosecution's request. Defendant also joined codefendant Vera's motion to sever the J.S./E.G. case from the Martinez case. Defendant argued severance was required in the interests of justice because, contrary to the prosecution's contention, the various crimes were of different classes. In addition, he argued a joint trial would be unfair because the evidence was much stronger in the Martinez case, where the victim positively identified him as a perpetrator, than it was in the other two cases, where there was little or no evidence identifying him. Vera argued there was an absence of "commonality" with respect to the nature and timing of the offenses and the witnesses to them; the evidence was not cross-admissible; and there was a danger of a "spillover" effect in which the stronger evidence in the Martinez case might bolster the weaker J.S./E.G. case. The court denied the motions. It properly did so.

" '[B]ecause consolidation or joinder of charged offenses ordinarily promotes efficiency, that is the course of action preferred by the law.' " (*People v. Hartsch* (2010) 49 Cal.4th 472, 493.) "Section 954 governs the issue of joinder of counts and it provides in pertinent part: 'An accusatory pleading may charge two or more different offenses connected together in their commission, . . . or two or more different offenses of *the same class of crimes or offenses*, under separate counts, . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately.' " (*People v. Jones* (2013) 57 Cal.4th 899, 924.) The crimes involved here—attempted murder, robbery, the sexual offenses, and carjacking—"are . . . deemed to be of the 'same class,' insofar as [they] share common characteristics as assaultive crimes against the person." (*People v. Lucky* (1988) 45 Cal.3d 259, 276.) "Because the charges were

14

properly joined under section 954, 'defendant must make a clear showing of prejudice to establish that the trial court abused its discretion in denying defendant's severance motion.' " (*People v. Valdez* (2004) 32 Cal.4th 73, 119.) That is, defendant must demonstrate the denial of his motion exceeded the bounds of reason. (*People v. Manriquez* (2005) 37 Cal.4th 547, 574.)

" ' "Refusal to sever [charges] may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a 'weak' case has been joined with a 'strong' case, or with another 'weak' case, so that the 'spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case." ' " (*People v. Geier* (2007) 41 Cal.4th 555, 575.) Regarding cross-admissibility, however, "section 954.1 expressly provides that 'where two or more accusatory pleadings charging offenses of the same class of crimes or offenses have been consolidated, evidence concerning one offense or offenses *need not* be admissible as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact.' (Italics added.) Thus, 'cross-admissibility is not the sine qua non of joint trials.' " (*Ibid.*)

Moreover, "[a]s we explained in *People v. Johnson* (1988) 47 Cal.3d 576, the issue of cross-admissibility 'is not cross-admissibility of the charged offenses but rather the admissibility of relevant evidence' that tends to prove a disputed fact. (*Id.* at p. 589; see Evid. Code, § 210.)" (*People v. Geier, supra,* 41 Cal.4th at p. 576.) Thus, we have said, " 'complete (or so-called two-way) cross-admissibility is not required. In other words, it may be sufficient, for example, if evidence underlying charge "B" is admissible in the trial of charge "A"—even though evidence underlying charge "A" may not be similarly admissible in the trial of charge "B." ' " (*People v. Hartsch, supra,* 49 Cal.4th at p. 493.)

15

Here, all three incidents involved a home invasion robbery, and in all three a victim's car was taken. The offenses occurred within the same geographical area (the eastern San Gabriel Valley) and within a relatively short period of time (between December 13, 1995, and January 19, 1996). Additionally, the J.S./E.G. and Weir robberies shared common characteristics in their commission. In both cases, the victims were initially approached in their garages as they returned home. The perpetrators covered their faces with ski masks and asked similar questions of the victims. Such evidence would have been cross-admissible to show a common plan or design. (Evid. Code, § 1101, subd. (b).) Defendant maintains that these similarities were not distinctive. But "[t]o establish the existence of a common plan or scheme [under Evidence Code section 1101, subdivision (b)], 'the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual.' " (*People v. Avila* (2006) 38 Cal.4th 491, 586.) The J.S./E.G. and Martinez cases featured another common characteristic: In each case, the perpetrators used items taken from the closets of the victims to tie them up.[6] Finally, stolen items from all three of the noncapital offenses were stored at Gladys Santos's apartment. Thus, the evidence was potentially cross-admissible in these three connected robberies.

"We emphasize, however, that, even if cross-admissibility did not support consolidation of the cases, the absence of cross-admissibility alone would not be

---

[6] Defendant argues that the prosecutor's offer of proof regarding the cross-admissibility of evidence, made in opposition to defendant's severance motion, was not supported by the record of the preliminary hearing. Defendant did not object to the offer of proof, so we may assume the prosecutor's representations about the evidence were accurate and made in good faith. Moreover, defendant fails to cite any authority that would limit the prosecutor's offer at a pretrial hearing on severance to the record of the preliminary hearing.

sufficient to establish prejudice where (1) the offenses were properly joinable under section 954, and (2) no other factor relevant to the assessment of prejudice demonstrates an abuse of discretion." (*People v. Geier, supra,* 41 Cal.4th at p. 577.)

Defendant attempts to establish prejudice by pointing to two other factors: (1) the facts of the J.S/E.G. and Martinez cases assertedly would have inflamed the jury against him and prevented a fair assessment of the evidence in the Weir case and; (2) there was a danger of a "spillover" effect by the joinder of the stronger Martinez case, where defendant was identified as the perpetrator, to the J.S./E.G. crimes, where evidence of his participation was weak. We are not persuaded.

Defendant asserts that the sexual offenses perpetrated against J.S. and the attack on Martinez were so brutal as to "evoke an emotional bias against the defendant as an individual and make the jury convict on bad character rather than subjecting the prosecution's evidence to scrutiny." The issue is not whether evidence of a violent offense evokes repulsion, but whether " 'strong evidence of a lesser but inflammatory crime might be used to bolster a weak prosecution case' on another crime." (*People v. Mason* (1991) 52 Cal.3d 909, 934.) First, it is not the case that the evidence of his participation in the J.S./E.G. and Weir home invasion robberies was "weak." Defendant's connection to those crimes was established by evidence that both J.S. and E.G. had identified defendant as a perpetrator—J.S. in open court during the preliminary examination and E.G. at a live lineup. Additionally, J.S. had repeatedly identified Pritchard and Vera, defendant's confederates, as perpetrators. While neither Ruth Weir nor her husband was able to identify any of their assailants, the prosecutor represented that defendant had admitted his participation in the Weir robbery to a witness, Gladys Santos. Thus, even to the extent the Martinez incident could be viewed as more inflammatory, joinder was not likely to prejudice him with regard to the jury's decision on the other charges.

Second, evidence of the Martinez attempted murder was not more inflammatory than the other crimes. Defendant himself equates the potentially inflammatory nature of the sexual assault on J.S. with the attempted murder of Martinez. His contention that evidence adduced regarding these charges would inflame the jury with respect to the "nonviolent robbery" of the Weirs minimizes the terrifying circumstances of the latter offense: Two days before Christmas, an elderly woman was confronted by armed, masked assailants who forced her at gunpoint into her own home; forced her and her husband to lie on the floor while they ransacked her residence; told her they would kill her if she was lying about whether there was money in the house; and when she protested the theft of her Christmas presents, held a gun to her head and asked her to choose between the presents and her life. These circumstances do not support defendant's characterization of the Weir home invasion robbery as "nonviolent." Accordingly, we reject defendant's claim that evidence of the J.S. and Martinez offenses was so much more inflammatory it would have rendered the jury incapable of fairly assessing the evidence pertaining to the Weir robbery.

Finally, defendant contends the consolidation of the Martinez case, in which defendant was identified as a perpetrator, with the J.S./E.G. and Weir cases, in which evidence of his identity was more circumstantial, would have had a "spillover" effect by "improperly bolstering the prosecution's weak evidence implicating [defendant] in the Weir and [J.S./E.G.] crimes." As explained above, the evidence connecting defendant to the latter crimes was not weak. Accordingly, the trial court could reasonably find that the jury would be able to fairly assess defendant's guilt as to all the charges, and did not abuse its discretion by denying the severance motion with respect to the J.S./E.G., Weir and Martinez crimes.

18

### 2. *Consolidation of Noncapital Charges With Special Circumstance Case*

Defendant contends the trial court abused its discretion when, after denying his severance motion, it subsequently consolidated the noncapital charges with the Witters capital murder case. Again, we find no abuse of discretion.

#### *a. Background*

The prosecution filed an information charging defendant and Drebert with the special circumstance murder of Witters and moved to consolidate that case with the case charging them, along with Pritchard and Vera, with the J.S/E.G., Weir and Martinez crimes. Defendant and Vera opposed consolidation. Vera, in particular, argued that he would be prejudiced because he was not involved in the murder. The court agreed and denied the consolidation motion. The prosecution responded by asking the court to sever defendant and Drebert from Pritchard and Vera, and then consolidate the capital and noncapital charges against defendant and Drebert. Over defendant's continued objection, the court granted the request.

#### *b. Discussion*

As noted, section 954 represents a legislative preference for the consolidation of charges "connected together in their commission" or "of the same class of crimes or offenses" (*ibid.*) because such joinder " 'ordinarily promotes efficiency.' " (*People v. Hartsch*, *supra,* 49 Cal.4th at p. 493.) Unquestionably, the Witters murder case, like the noncapital charges, involved an "assaultive crime" against a person (*People v. Lucky*, *supra*, 45 Cal.3d at p. 276) and could be properly joined.

Defendant nonetheless contends consolidation was error because evidence of the noncapital crimes would not have been admissible in the guilt phase of the Witters special circumstance case had it been tried separately. The prosecutor's theory of cross-admissibility was that defendant admitted his participation in both the Witters and Weir cases to the same witness, Gladys Santos. The prosecutor also argued Drebert's participation in the Witters case was admissible to defeat any claim by Drebert that he

19

was unaware that defendant intended to attack Martinez when Drebert agreed to enter Martinez's apartment and commit a robbery. On appeal, defendant contends Santos's testimony regarding defendant's admission that he robbed the Weirs would not have been admissible at a separate trial of the Witters murder, nor would his admission that he killed Witters have been admissible at a separate trial of the Weir case. He argues further that the cross-admissibility of evidence regarding Drebert's knowledge and intent is, essentially, irrelevant to the question of the cross-admissibility of the evidence as to defendant himself.

Although the prosecutor did not argue this point below, we have already noted that evidence of the geographic and temporal proximity of the four home invasion robberies, along with certain common characteristics of those crimes, would have been admissible to show a common plan for purposes of Evidence Code section 1101, subdivision (b). In any event, even if we assume there was no cross-admissible evidence between the Witters case and the other three cases, the absence of such evidence is not dispositive. " 'Cross-admissibility . . . is sufficient but not necessary to deny severance. [Citation.] As the four-part test is stated in the conjunctive, joinder may be appropriate even though the evidence is not cross-admissible . . . .' " (*People v. Ramirez* (2006) 39 Cal.4th 398, 440.)

The remaining relevant considerations favor consolidation. The murder of Koen Witters was not less inflammatory than the evidence of the sexual assault of J.S., the attempted murder of Martinez or the invasion of the Weirs' home. Thus, joinder was not " ' " 'unusually likely to inflame the jury against the defendant.' " ' " (*People v. Ramirez*, *supra*, 39 Cal.4th at p. 439.) Nor was the evidence in the Witters case weaker than such evidence in the other cases so as to create the danger of a spillover effect. (*Ibid.*) Finally, the fact the Witters case was a capital case did not cut against consolidation where the "evidence of each charge [was] so strong that consolidation is unlikely to [have affected] the verdict." (*People v. Ochoa* (2001) 26 Cal.4th 398, 423.)

20

Accordingly, we conclude the trial court properly exercised its discretion in consolidating the capital and noncapital charges.

### 3. Gross Unfairness

Defendant lastly contends that, even if the trial court's severance and consolidation rulings were correct when made, reversal of the judgment is required because the joint trial resulted in such gross unfairness as to amount to a due process violation. (*People v. Hartsch*, *supra*, 49 Cal.4th at p. 494.) The claim is meritless.

Defendant contends joinder allowed the prosecutor to improperly use Martinez's identification of defendant as his assailant to bolster weaker evidence of defendant's participation in the remaining offenses. We perceive no such impropriety.[7] Evidence that defendant was the ringleader of a group that included Drebert, Pritchard and Vera, and that J.S. identified Pritchard and Vera as two of the perpetrators, along with DNA evidence connecting defendant to the sexual assault against J.S., could, combined with other evidence, support the inference that defendant was one of the other men involved in the other incidents. As we explained in similar circumstances, a prosecutor may properly argue that defendants probably acted in concert when the evidence established they had a history of doing so. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 152.) In short, we reject defendant's claim that there was anything unfair, much less grossly unfair, in the manner in which the prosecutor connected defendant to the four crimes.

Defendant also argues he was denied due process because consolidation of the cases allowed the prosecutor to present inflammatory evidence suggesting defendant belonged to a gang. The only evidence that defendant was a gang member was

---

[7] To the extent defendant is asserting that the prosecutor committed misconduct by misstating the evidence in his closing argument, that claim is forfeited by his failure to have lodged a timely objection to the statements at issue. (*People v. Linton* (2013) 56 Cal.4th 1146, 1205.)

21

Martinez's testimony that he feared defendant because he believed defendant was a gang member. The prosecutor did not refer to this testimony. The prosecutor made a few references to the gang-like appearance and behavior of defendant and his three cohorts, but these references, fleeting and ambiguous, did not identify defendant as a member of a known street gang. To the extent defendant's complaint is that there were suggestions defendant, Drebert, Pritchard and Vera acted like a gang in the colloquial sense, the short answer is that they did. Such a colloquial understanding is quite different, however, from a potentially prejudicial suggestion that defendant belonged to one of the well-established criminal street gangs operating in Southern California. Other than Martinez's brief testimony, no such connection was made by the evidence or suggested by the prosecutor.

## B. Asserted Errors During Voir Dire of Prospective Jurors

### 1. Dismissal of Jurors Who Stated They Would Be Unable to Impose the Death Penalty

Defendant contends the trial court violated his right to a fair trial by an impartial jury by excusing 22 prospective jurors who, in response to the court's query, stated they would be unable or unwilling to impose the death penalty regardless of the evidence. In support of his claim, he relies on *People v. Stewart* (2004) 33 Cal.4th 425 (*Stewart*), and *People v. Heard* (2003) 31 Cal.4th 946 (*Heard*), in which we found error. We reject defendant's claim the circumstances of this case are analogous to those in the cited cases.

The trial court conducted a preliminary screening of four panels of prospective jurors. The court first considered financial hardship requests. It then described in general terms the nature of the case. It told the first panel: "One of the charges against [defendant] in this case is murder, and it's alleged that it's murder in the first degree. [¶] It's further alleged that due to the manner in which the murder was committed, that special circumstances exist. [¶] If the jury in this case finds [defendant] guilty of murder in the first degree, and further finds that the special circumstances allegation is true, the jury in this case will be asked to determine the penalty in this case. [¶] The jury will

22

have two options, and two options only, and that will be life without the possibility of parole, that will be life in prison, or death. [¶] The reason I'm mentioning that is this: Now, without knowing anything at all about this case, is there any juror sitting in the audience right now that, regardless of what the evidence might be, has such feelings about the death penalty that he or she would be unable to vote to impose the death penalty in this case. [¶] If the answer is yes, if you'd rise, please."

Ten jurors in the first panel responded affirmatively. The court questioned each of them to confirm they would refuse to impose the death penalty regardless of the evidence. For example, the court asked Prospective Juror C.M.: "Miss [M.], that is regardless of what the evidence is; is that correct?" When she answered "yes," the court excused her. Prospective Juror D.G. was asked, "Miss [G.], your answer is that you would be unable to vote to impose the penalty of death, regardless of the evidence?" The juror answered "yes" and was excused. The court asked essentially the same question of the remaining eight jurors: whether, regardless of the evidence, the prospective juror would be unable to vote to impose the death penalty. It excused the jurors when they answered affirmatively.

The trial court asked a similar question with respect to whether any prospective jurors would vote to *impose* the death penalty regardless of the evidence. No prospective juror responded affirmatively. Only after this screening was completed were the remaining prospective jurors asked to fill out the juror questionnaire.

Defendant's objection to the procedure was overruled, as was his renewed objection later in the proceedings, and the trial court used the same procedure when conducting its preliminary screening of the other three panels. The court briefly explained the charges against defendant and the penalty options that would be before the jury should defendant be convicted and the special circumstances found true. The court then asked whether, because of a prospective juror's feelings about the death penalty, that person would be unable to vote to impose death regardless of the evidence. The court

23

questioned each prospective juror who answered affirmatively to confirm he or she would not vote to impose the death penalty regardless of the evidence. Some of these colloquies were more extensive than others, and on three occasions when there was ambiguity in the prospective juror's response the trial court did not excuse the individual. In all, the trial court used this procedure to excuse 22 prospective jurors.

"Under decisions of the United States Supreme Court, prospective jurors who express personal opposition to the death penalty are not automatically subject to excusal for cause as long as 'they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.' (*Lockhart v. McCree* (1986) 476 U.S. 162, 176; see *Witherspoon v. Illinois* (1968) 391 U.S. 510, 522 . . . .) To determine if a prospective juror is excusable for cause without compromising a defendant's constitutional rights, we inquire whether the prospective juror's views on the death penalty 'would "prevent or substantially impair the performance" ' of the juror's duties in accordance with the court's instructions and his or her oath. (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 (*Witt*).)" (*People v. Riccardi* (2012) 54 Cal.4th 758, 778.) "Under *Witt*, a prospective juror is 'substantially impaired' and may properly be excused for cause if he or she is unable to follow the trial court's instruction and 'conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate.' " (*People v. McKinnon* (2011) 52 Cal.4th 610, 635.) "In according deference on appeal to trial court rulings on motions to exclude for cause, appellate courts recognize that a trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the record. [Citation.] As the high court observed in *Witt, supra,* 469 U.S. 412, 428, 'the question whether a venireman is biased has traditionally been determined through *voir dire* culminating in a finding by the trial judge concerning the venireman's state of mind . . . based upon determinations of demeanor and credibility that

are peculiarly within a trial judge's province.' Indeed, as the high court noted in *Witt*, ' "[T]he manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words. That is seen below, but cannot always be spread upon the record. Care should, therefore, be taken in the reviewing court not to reverse the ruling below upon such a question of fact, except in a clear case." ' " (*Stewart*, *supra*, 33 Cal.4th at p. 451.)

Defendant characterizes the trial court's questioning of prospective jurors as "perfunctory" and argues it was inadequate to protect his right to a fair trial by an impartial jury because the court failed "to explain[] the applicable law or conduct[] any inquiry into whether the jurors could temporarily put aside [their opposition to the death penalty] and follow the law in this case."[8] We are not persuaded.

"Recent decisions of this court have emphasized the importance of meaningful death-qualifying voir dire. We have reminded trial courts of their duty to know and follow proper procedure, and to devote sufficient time and effort to the process. [Citations.] At bottom, both the court and counsel 'must have sufficient information regarding the prospective juror's state of mind to permit a reliable determination as to whether the juror's views [on capital punishment] would " 'prevent or substantially impair' " the performance of his or her duties.' [Citation.] . . . [¶] Nonetheless, the trial court has broad discretion over the number and nature of questions about the death

---

[8]     The Attorney General contends defendant has forfeited this claim because he failed to specifically object to the adequacy of the trial court's voir dire of the prospective jurors. Defendant objected twice to the trial court's excusal of the prospective jurors. In any event, at the time of defendant's trial, a no-forfeiture rule was in effect with respect to *Witherspoon/Witt* claims. (*People v. McKinnon, supra*, 52 Cal.4th at p. 637.) We abandoned that rule in *McKinnon*, and now require an objection to preserve such claims, but "because at the time of this trial we had not expressly held that an objection is necessary to preserve *Witherspoon/Witt* excusal error on appeal, we do not apply this rule here." (*Id.* at p. 643.)

penalty. We have rejected complaints about 'hasty' [citation] or 'perfunctory' voir dire." (*People v. Stitely* (2005) 35 Cal.4th 514, 539–540.) While the trial court's preliminary screening of the prospective jurors here was relatively brief, the question it posed to the prospective jurors—whether, *regardless of the evidence*, they would be unwilling or unable to impose the death penalty—was unequivocal. (See *People v. Riccardi, supra,* 54 Cal.4th at p. 780.)

In *Riccardi*, question No. 68 of the juror questionnaire asked: " 'Do you have such an opinion concerning the death penalty that, regardless of the evidence that might be developed during the penalty phase of the trial . . . you would automatically and absolutely refuse to vote for the death penalty in any case?' " (*People v. Riccardi, supra,* 54 Cal.4th at p. 780.) The defendant argued that four prospective jurors were improperly excused based solely on their answers to the juror questionnaire because, taken as a whole, their responses were ambiguous and required further examination. Three of those prospective jurors had answered "yes" to question No. 68. In rejecting the defendant's argument, we observed: "Given that question No. 68 was phrased unequivocally, a prospective juror's decision to write 'yes' as an answer clearly established that the prospective juror held a bias against the death penalty that 'would "prevent or substantially impair" ' the performance of his or her duties as a juror even if the evidence leaned in favor of imposing death." (*Ibid.;* see *People v. Avila, supra,* 38 Cal.4th at p. 531 ["The questionnaire at issue here . . . asked whether a prospective juror held such conscientious objections to the death penalty that, regardless of the evidence or the strength of proof, he or she 'automatically' would refuse to return a first degree murder verdict, find a special circumstance true, or impose the death penalty. Any juror who 'automatically' would vote in ways that precluded the death penalty would clearly be disqualified under [*Wainwright v.*] *Witt*[*, supra,* 469 U.S. 412]."].)

Here, too, the trial court asked whether any prospective juror's opposition to the death penalty would preclude her or him from imposing it regardless of the evidence.

26

Those who answered "yes," and whose answer was confirmed by further questioning by the trial court, were disqualified. While brief, the trial court's questioning was not rote. Some prospective jurors expanded their responses making it even clearer their opposition to the death penalty would preclude them from imposing it. For example, one prospective juror informed the court, "I am strongly against the death penalty. I'm against it." When the court asked, "In any case?" the prospective juror replied, "In any case. Life imprisonment, I'm okay; but death, I'm against it." The court continued the colloquy, asking, "So you would be unable to vote to impose the death penalty in this case or in any case; is that right?" "Yes," the prospective juror replied. She answered "yes" again when the court asked a final question: "Regardless of the evidence?" Another juror explained that even killing a fish while fishing had been so upsetting to her that "there is no way I could even consider anything like [the death penalty]." The court asked, "You couldn't conceive of an instance so terrible that you would vote to impose the death penalty?" The prospective juror replied, "No, not at all." Still, the court probed further, eliciting from the prospective witness repeated statements affirming she would not impose the death penalty in any case ("Everything has a right to live"), under any circumstance ("No circumstance"), and regardless of the evidence ("Regardless").

On the other hand, the three prospective jurors whose answers were confused or ambiguous were not excused. Moreover, unlike in *People v. Riccardi*, *supra*, 54 Cal.4th 758, or *People v. Avila*, *supra*, 38 Cal.4th 491, the trial court had the opportunity to observe the prospective jurors as they responded to its questions, permitting it to evaluate their credibility and their conviction. The trial court's ability to "assess the demeanor of the venire, and of the individuals who compose it, [is] a factor of critical importance in assessing the attitude and qualifications of potential jurors." (*Uttecht v. Brown* (2007) 551 U.S. 1, 9.) Thus, "the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts." (*Ibid.*) Finally, "[w]hen a juror has clearly expressed an inability to vote for the death penalty regardless of the

27

evidence that may be produced at trial, the court has discretion to limit further voir dire directed toward persuading the juror that there may be some circumstance which he has not considered that could cause him to modify his conscientious or moral attitude toward the death penalty." (*People v. Mattson* (1990) 50 Cal.3d 826, 846; accord, *People v. Fuiava* (2012) 53 Cal.4th 622, 714.)

Defendant's reliance on *Stewart*, *supra*, 33 Cal.4th 425, and *Heard*, *supra*, 31 Cal.4th 946, is misplaced because those decisions involve factual circumstances not present here. "[T]he trial court in *Stewart* excused prospective jurors based solely on their answers to a written question concerning whether their death penalty views would ' "prevent or make it very difficult" ' to determine the appropriate penalty, and without engaging in oral voir dire. (*Stewart, supra,* 33 Cal.4th at pp. 444, 446–447, italics omitted.)" (*People v. Watkins* (2012) 55 Cal.4th 999, 1017.) "As we observed, even one who gave a straightforward 'yes' answer to such questions would not necessarily demonstrate disqualification under *Witt*, because mere *difficulty* in imposing the death penalty does not, per se, prevent or substantially impair the performance of a juror's duties. The prospective juror might nonetheless be able to put aside his or her personal views and deliberate fairly under the death penalty law. Yet the *Stewart* questionnaire did not inquire whether the prospective juror could do so." (*People v. Avila, supra,* 38 Cal.4th at p. 530.) In this case, unlike in *Stewart*, the jurors were personally questioned by the trial court. And unlike the questionnaire in *Stewart,* the court's questions here did not use the "make it very difficult" formulation, but asked the jurors unequivocally whether he or she would be unable to apply the death penalty. Accordingly, *Stewart* is inapplicable here.

*Heard, supra,* 31 Cal.4th 946, also involved circumstances quite different from those presented in this case. In *Heard,* a prospective juror indicated on the juror questionnaire he believed life without possibility of parole was a worse penalty than death. When questioned by the trial court about his response, however, the prospective

28

juror "made it quite clear that he would not vote 'automatically'—in other words, 'no matter what the evidence showed'—either for life imprisonment without the possibility of parole or for death, and also that he would not be reluctant to find the defendant guilty of first degree murder or to find the special circumstances true 'so as to avoid having to face the issue of the death penalty.' " (*Id.* at p. 964.) Given the prospective juror's oral responses, we concluded the trial court had improperly excused him for cause. (*Ibid*.) In this case, by contrast, the excused jurors clearly stated they would be unable to impose the death penalty regardless of what the evidence showed. We thus reject defendant's contention that *Stewart* and *Heard* require reversal in this case.

The dissent maintains that the trial court's excusal of 16 prospective jurors from the first two panels was error because the trial court did not conduct a further inquiry after they unequivocally stated they would not impose the death penalty regardless of the evidence. The dissent would have had the trial court explain to the prospective jurors the bifurcated nature of a capital case, the possibility that evidence in aggravation and mitigation might be presented at the penalty phase and the weighing process the jury engages in with respect to such evidence, and have inquired of them whether they could put aside their views and follow the law.

As noted, the trial court exercises its discretion over the number and nature of questions about the death penalty. (*People v. Stitely, supra,* 35 Cal.4th at pp. 539–540.) There is no requirement that a trial court engage in the exposition the dissent would impose upon it. The issue here is not whether the prospective jurors were simply opposed to the death penalty or "did not believe in it," a circumstance that would require further voir dire, but whether their opposition would disable them from imposing the death penalty *regardless of the evidence*. Although the trial court did not ask the jurors if they could set aside their feelings and follow the court's instructions, the court's inquiry did call on the jurors to assess their ability to vote for death. If a prospective juror states unequivocally that he or she would be unable to impose the death penalty regardless of

29

the evidence, the prospective juror is, by definition, someone whose views "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Witt, supra,* 469 U.S. at p. 424.) Further inquiry concerning the juror's ability to follow the law is not required.

In reviewing the trial court's determination, we apply a "rule of deference" (*Uttecht v. Brown, supra,* 551 U.S. at p. 7) based on the trial court's ability to assess the demeanor and credibility of the prospective witness (*Darden v. Wainwright* (1986) 477 U.S. 168, 178). The dissent rejects application of the rule here, asserting-the trial court spent insufficient time questioning the individual prospective jurors to have drawn any conclusions regarding their demeanor or credibility. (Dis. opn., at pp. 14–15.) Certainly the trial court could have conducted a fuller inquiry and the better practice is to do so. But the reviewing court applies the rule to the circumstances before it, not the circumstances it might have wished for. (*Uttecht v. Brown, supra,* at p. 7 ["Deference is owed regardless of whether the trial court engages in explicit analysis regarding substantial impairment."].) The fact remains the trial court was present at the voir dire and we were not. The dissent cites no authority for the proposition that the trial court must spend a certain amount of time, give certain explanations, ask certain questions, or make findings on the record in support of its determination before a reviewing court applies the rule of deference.

The dissent's reliance on the *Darden* decision is misplaced. That opinion does not stand for the proposition that a trial court cannot excuse a prospective juror based on his or her unequivocal answer to a single question unless the record reveals the prospective juror received additional information regarding assessment of the penalty. The claim raised and rejected in *Darden* was that the trial court had misstated the *Witt* standard. (*Darden v. Wainwright, supra*, 477 U.S. at pp. 175–178.) The court's examination of the context in which the challenged question was asked was to determine whether the court had "stated the correct standard when questioning individual members of the venire."

30

(*Id.* at p. 177.) The court concluded it had and that the jurors whose excusal was challenged had heard the court repeatedly do so. (*Id.* at pp. 177–178.)

In sum, we conclude the trial court did not improperly excuse those jurors who expressed an unequivocal inability to apply the death penalty regardless of the evidence. Although not a model for future courts, the voir dire technique used here resulted in no constitutional impropriety. We note, however, that a more complete voir dire by trial courts would assist our review of a defendant's claim of *Witt* error, and we encourage trial courts to question prospective jurors at sufficient length to clearly establish their views on their ability to impose the death penalty.

### 2. *Dismissal of Prospective Juror No. 2361*

Defendant contends the trial court improperly excused for cause Prospective Juror No. 2361, a juror who, although not excused in the initial questioning discussed *ante*, was subsequently found to be unable to fairly consider the death penalty. We reject the claim.

Asked in his juror questionnaire about his "general feelings" toward the death penalty, Prospective Juror No. 2361 wrote, "I don't believe in death penalty." He indicated further his view that California should not have a death penalty and that the death penalty should not be used. In response to a question whether he would be able to impose the death penalty "if you believed, after hearing all of the evidence, that the penalty was appropriate," he answered, "No." Finally, in response to a question that asked, "What do you believe the purpose of the death penalty to be?" he responded, "I don't believe in death penalty."

When questioned by the trial court about these responses, however, the prospective juror stated he could vote to impose the death penalty "[d]epending on the evidence." When asked by the court whether he could set aside his personal beliefs and apply the law objectively, he responded, "Right." Upon questioning by the prosecutor, the prospective juror repeated his statement he could vote for the death penalty

31

"depending on the evidence."  The prosecutor then asked:  "Is there a reason why [when] the questionnaire asked you that question, or asked you the question of whether or not you could impose death on someone, despite your personal views, you indicated that you couldn't?  [¶]  Have you changed your mind since the questionnaire?"  The prospective juror replied, "No."  The defense made no further effort to rehabilitate him.  Over defendant's objection, the trial court excused the juror, explaining, "he . . . indicated in response to the district attorney's questions that his basic decision hasn't changed from what he wrote down on the questionnaire, [on] which he indicated he did not believe in the death penalty."

As noted, under *Witt*, a prospective juror may be excluded for cause because of that individual's views on the death penalty if such views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' "  (*Wainwright v. Witt, supra,* 469 U.S. at p. 424.)  *Witt* instructs further that "this standard . . . does not require that a juror's bias be proved with 'unmistakable clarity.'  This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism.  What common sense should have realized experience has proved:  many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings.  Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . .  [T]his is why deference must be paid to the trial judge who sees and hears the juror."  (*Id.* at pp. 424–426, fn. omitted.)  "[I]n determining whether the removal of a potential juror would vindicate the State's interest [in having jurors who are able to apply the death penalty within the framework of the law] without violating the defendant's right [to an impartial

32

jury], the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts." (*Uttecht v. Brown, supra,* 551 U.S. at p. 9.) " ' "On appeal, we will uphold the trial court's ruling if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous." ' " (*People v. Edwards* (2013) 57 Cal.4th 658, 752.)

The explicit reason given by the trial court for excusing the prospective juror was that, notwithstanding his oral assertion that he could vote to impose the death penalty "depending on the evidence," he also said the strongly anti-death-penalty views he had expressed in his juror questionnaire had not changed. In the questionnaire he stated he would decline to apply the death penalty regardless of the evidence, a statement in direct conflict with what he said in court. The record thus supports the trial court's ruling because it shows the juror gave inconsistent statements regarding his ability to vote to impose the death penalty. Implicit in the trial court's ruling was its conclusion the prospective juror's questionnaire responses, rather than those he gave in court about his willingness to consider the death penalty, reflected his true state of mind. "This determination of [his] state of mind is binding." (*People v. Edwards, supra,* 57 Cal.4th at p. 752.) We thus reject defendant's challenge to Prospective Juror No. 2361's dismissal for cause.

### 3. Denial of Request for Individual Sequestered Voir Dire Concerning the Death Penalty

At the time of defendant's trial, Code of Civil Procedure section 223 (section 223) provided in relevant part: "Voir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors in all criminal cases, including death penalty cases." This statute, enacted in 1990 as part of Proposition 115, abrogated our decision in *Hovey v. Superior Court* (1980) 28 Cal.3d 1, which, as a rule of judicial procedure, had

33

required the death-qualification portion of voir dire in capital cases to be sequestered. (*People v. Burney* (2009) 47 Cal.4th 203, 240.)

Defendant filed a pretrial motion asking the trial court to exercise its discretion under section 223 and conduct sequestered voir dire. Citing *Hovey,* the motion asserted generally that such sequestered voir dire "is the most effective method of preventing prospective jurors from being influenced by others in the responses to the death-qualification aspect of the voir dire process and enabling the parties to discover bias."

Without ruling on the motion, the trial court conducted its preliminary screening of the first and second panels of prospective jurors, during which, as noted, it excused some members of the panel based upon their professed inability to vote for the death penalty. During a break in the proceedings following the screening of the second panel, the trial court took up defendant's sequestration motion. The prosecutor joined in the motion, although he acknowledged "the Court has the discretion to go either way, and I'll submit on [defendant's] papers." The court denied the motion without further discussion.

Defendant asserts that the trial court failed to exercise its discretion under section 223, resulting in a miscarriage of justice. (Cal. Const., art. VI, § 13.) He also contends the trial court's ruling violated his state and federal constitutional rights to due process, equal protection, trial by an impartial jury, effective assistance of counsel, and a reliable death penalty. (U.S. Const., 6th, 8th, & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 16.)[9] The claims are without merit.

---

**9** "As to this and virtually all other appellate claims, defendant contends that an issue raised and decided in the trial court resulted in constitutional violations, but he did not present those constitutional theories below. In such instances, it appears that (1) the appellate claim is the kind that required no trial court action to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court was asked to apply, but merely assert that the trial court's act or omission, in addition to being wrong for reasons actually presented to that court, had the legal consequence of violating the United States and California Constitutions. To that extent, defendant's new

*(footnote continued on next page)*

Defendant claims the trial court's failure to provide reasons for its ruling amounted to a failure to have exercised its discretion under section 223. Not so. Unquestionably, the trial court was aware of its discretionary authority, given that defendant's motion and the prosecutor's comments explicitly mentioned it. There is nothing in the statute requiring the trial court to set forth its reasons for its rulings on such a request. Moreover, defendant's motion was a generic, boilerplate one that made no attempt to show specifically why open court voir dire in this case was not practicable. (See *People v. Vieira* (2005) 35 Cal.4th 264, 288 [group voir dire may be impracticable "when, in a given case, it is shown to result in actual, rather than merely potential, bias"].) Accordingly, nothing in defendant's motion required a detailed trial court ruling. "In view of the circumstance that defendant offered only generalized grounds for conducting individual voir dire, not specific to his case, the trial court's ruling did not fall outside the bounds of reason." (*People v. Burney, supra,* 47 Cal.4th at p. 241.) Thus, we reject defendant's claim that the trial court failed to exercise its discretion and, to the extent he also contends denial of his motion was an abuse of discretion, we reject that argument as well. (*People v. Watkins, supra,* 55 Cal.4th at p. 1011.)

### 4. *"Death Qualification" of the Prospective Jurors*

Defendant contends the process by which a death penalty jury is selected in California, and which was used in this case, violates the Sixth, Eighth and Fourteenth

---

*(footnote continued from previous page)*

constitutional arguments are not forfeited on appeal. (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 . . . , applying *People v. Partida* (2005) 37 Cal.4th 428, 433–439.) In the latter case, no separate constitutional discussion is required or provided where rejection of a claim that the trial court erred on the issue presented to that court necessarily leads to rejection of any constitutional theory or 'gloss' raised for the first time here." (*People v. Contreras* (2013) 58 Cal.4th 123, 139, fn. 17.) We apply this principle here and elsewhere where defendant asserts on appeal constitutional claims not advanced below.

Amendments to the United States Constitution and article I, section 16 of the state Constitution, by depriving him of his rights to due process, a fair trial, a fair and reliable guilt and penalty phase determination and to a jury selected from a representative cross-section of the community. He acknowledges both we and the United States Supreme Court have rejected the claims he makes here. (*Lockhart v. McCree, supra,* 476 U.S. at p. 176 [exclusion of prospective jurors based on their views of capital punishment does not contravene a defendant's Sixth and 14th Amend. right to a jury selected from a fair cross-section of the community or to an impartial jury]; *People v. Lenart* (2004) 32 Cal.4th 1107, 1120 [exclusion of prospective jurors based on their views of capital punishment does not contravene a defendant's state constitutional right to due process and jury protections]; *People v. Watkins, supra,* 55 Cal.4th at p. 1011 [there is no federal or state constitutional right to individual sequestered voir dire in capital cases].) Defendant contends that *Lockhart* was wrongly decided. His criticism of *Lockhart* is more properly addressed to the United States Supreme Court. In any event, we are not persuaded that our precedents were in error and thus decline to revisit our decisions.

## C. Guilt Phase Claims

### 1. Assertedly Erroneous Limitations on Cross-examination of Prosecution Witness Gladys Santos

Defendant contends the trial court erroneously restricted his cross-examination of Gladys Santos when it precluded questioning her about (1) her two misdemeanor petty theft convictions; (2) whether she bartered drugs for stolen property and whether her credibility was affected by her concern this information would adversely impact her custody of her children and her eligibility for public assistance; and (3) the prosecutor's contacts with the department of children's services (Department) on Santos's behalf. The claims are both forfeited and meritless.

36

### a. Background

In an in camera discussion before he presented Santos's testimony, the prosecutor disclosed Santos's two misdemeanor convictions for petty theft. He disclosed further that, because of threats from defendant, the district attorney's office had relocated Santos and her family. He also revealed that the Department had threatened to remove Santos's children because, in its view, her status as a witness in this case endangered them. The prosecutor said he had spoken to the Department on her behalf to prevent the removal of her children. Finally, the prosecutor said Drebert's attorney had told him she intended to ask Santos whether she had supplied methamphetamine to Drebert and defendant. The prosecutor had a detective ask Santos about this allegation. According to the prosecutor, Santos told the detective she had supplied defendant with methamphetamine twice because defendant was "bugging" his cousin, Joanne Rodriguez, with requests for drugs.

After revealing this information, the prosecutor argued Santos's misdemeanor convictions were inadmissible. The trial court responded: "[T]he law is quite clear that the convictions themselves are hearsay, so the convictions themselves are not admissible. [¶] However, if any witnesses are prepared to testify to exactly what she did on those occasions, that would be admissible." The prosecutor replied, "There is [*sic*] no witnesses I'm aware of that are here." At that point, defendant's counsel interjected that Santos had been on probation at the time of the offenses and argued her probationary status was admissible. The trial court agreed but "without specifying what the offense is." The court granted the prosecutor's request her status be characterized as misdemeanor probation.

The court excluded as irrelevant evidence of the prosecutor's dealings with the Department. Defendant's counsel replied, "I wasn't going to go into that."

The trial court further ruled that the defense could inquire into the issue of whether Santos had supplied drugs to the defendants. The court confirmed, in response to a

37

question by the prosecutor, that the petty theft convictions were not admissible absent witnesses who could testify to the underlying conduct.

On the issue of Santos's relocation, defendant argued that her request to be relocated was relevant. The court responded: "And it becomes relevant as to why she made the requests," impliedly referring to the fact that defendant had threatened her. Defense counsel agreed: "That's the other side of the coin." The court replied: "So you decide if you really want to get into that, [counsel.]"

Later in the proceedings, Drebert's attorney informed the court she intended to ask Santos whether she had dealt drugs to individuals other than Drebert and defendant. She argued Santos's drug dealing was relevant to her credibility because, if she were revealed to be a drug dealer, she might lose custody of her children and her public assistance benefits. When asked by the trial court whether she had any witnesses to testify to buying drugs from Santos, Drebert's attorney replied she had had a phone call from a potential witness but could not confirm if there were sufficient facts and details. The prosecutor objected that such testimony would be collateral and irrelevant. The trial court disagreed: "The sale of drugs is an act of moral turpitude, and whether or not she's ever been arrested or convicted for such conduct, the conduct in and of itself would appear to me to be relevant." The court limited evidence of Santos's prior narcotics transactions to those with defendants unless, as Drebert's counsel stated, "I produce someone . . . that will take the stand." At no point did defendant's counsel join in the discussion of whether such evidence was admissible or indicate such witnesses were available.

### b. Discussion

"Cross-examination may expose facts from which jurors can appropriately draw inferences about the reliability of a witness, including the possibility of bias. The trial court, however, has wide latitude to restrict such cross-examination, and such testimony

is properly barred unless the defendant can show the prohibited cross-examination would have produced a significantly different impression of the witness's credibility." (*People v. Brady* (2010) 50 Cal.4th 547, 560; see *People v. Smith* (2007) 40 Cal.4th 483, 513.)

Regarding Santos's misdemeanor convictions for petty theft, defendant contends the trial court erroneously ruled that "evidence of [the underlying] conduct had to be supplied by someone other than Santos." The record reveals some ambiguity about whether the trial court so ruled. Consistent with our decision in *People v. Wheeler* (1992) 4 Cal.4th 284, the trial court ruled the fact of Santos's convictions was inadmissible hearsay but evidence of the underlying criminal conduct was admissible "if any witnesses are prepared to testify to exactly what she did on those occasions . . . ." (See *id.* at pp. 295–300.) Obviously, Santos herself would have been a percipient witness to her own conduct and the trial court's initial ruling did not explicitly preclude defendant from questioning her about it. Later, however, the trial court did state that, while Santos could be questioned about her probationary status, "there will be no inquiry as to what particular offense she was on probation for." This does suggest the trial court intended to preclude the defense from questioning Santos about the circumstances surrounding her misdemeanor convictions. Such ruling would have been error. (*Id.* at p. 300, fn. 14 ["proof of impeaching misdemeanor conduct" may be in the form of a "witness's admission on direct or cross-examination that he or she committed such conduct" as well as by other means].)

Nonetheless, any error was harmless. The jury heard evidence that Santos was on probation, had supplied defendant with drugs, and initially had been arrested because she had lied to the police about harboring him, and that her apartment had been a repository for defendant's stolen goods. Evidence that she had also committed petty theft would not have produced a significantly different impression of her credibility.

Defendant also argues the trial court improperly denied him the opportunity to question Santos about whether she bartered drugs to third parties in exchange for stolen

property.  Defendant forfeited this claim because it was Drebert, not he, who sought to question Santos on this point.  During the extensive discussion between Drebert's counsel, the prosecutor, and the trial court about this issue, defendant's counsel remained silent.  He did not join Drebert's request, much less make an offer of proof as to the relevance of the evidence to his defense (as opposed to Drebert's).  His claim is therefore forfeited.  (Evid. Code, § 354.)  Moreover, the trial court did not absolutely bar Drebert (or defendant) from cross-examining Santos about her alleged drug dealing.  To the contrary, the trial court acknowledged that it would be a permissible area of inquiry for impeachment purposes.  Reasonably viewing the discussion, the court properly required only that Drebert demonstrate a good faith basis for asking such questions by, for example, identifying a potential witness to her having dealt drugs.  (*People v. Pearson* (2013) 56 Cal.4th 393, 434.)  Drebert failed to do so; defendant did not add anything.

Similarly forfeited is defendant's claim the trial court improperly restricted him from cross-examining Santos regarding the prosecutor's contacts with the Department on Santos's behalf after the Department threatened to remove her children because of her status as a witness in this case.  The trial court ruled the subject matter was irrelevant, at which point defendant's counsel replied, "I wasn't going to go into that."  Defendant not only failed to challenge the court's ruling, he indicated agreement with it and a preexisting decision not to question her about the contacts, perhaps again to avoid mention of the threats defendant had made.  Accordingly, defendant may not now assert the ruling was error, nor does the record support a conclusion that it was the ruling, rather than his own tactical decision, that led to the absence of cross-examination on the subject.

2.  *Asserted* Aranda/Bruton *Error*

Defendant claims that Gladys Santos's testimony regarding the circumstances under which she questioned defendant about whether he had killed Koen Witters constituted *Aranda/Bruton* error because it revealed the source of her information was

codefendant Drebert. (*People v. Aranda, supra,* 63 Cal.2d 518; *Bruton v. United States, supra,* 391 U.S. 123 [a nontestifying codefendant's extrajudicial statement that incriminates the other defendant is inadmissible as a violation of the latter's rights to confrontation and cross-examination].)[10] The claim is meritless.

Defendant and Drebert were tried together but before separate juries to avoid defendant's jury hearing Drebert's detailed statement to Santos inculpating defendant. Defendant's jury did, however, hear Santos testify to her conversation with defendant during which he admitted to killing Witters. The source of Santos's information with which she confronted defendant was Drebert. Before her testimony, the prosecutor sought guidance from the trial court regarding how to approach that issue. The court told the prosecutor he could not mention Drebert as the source of Santos's information. Defendant's counsel suggested the *Aranda/Bruton* problem could be resolved if the prosecutor asked Santos, "Did you receive information about the homicide?" and "[D]id you receive that information from another party . . . ?" The prosecutor suggested he ask Santos whether she had received the information about the murder from a civilian source (as opposed to a police source). The trial court agreed: "Yes, civilian source with personal knowledge."

Before the jury, the prosecutor asked Santos whether in December 1995, she had "a conversation with someone who had indicated that they were present at a murder?" When she responded affirmatively, the prosecutor clarified: "This person . . . wasn't a police officer; is that right?" After ascertaining the conversation occurred before Christmas, the prosecutor asked: "After you had this conversation with this person who said he had been at a murder, did you have a conversation with [defendant]?" Santos

_____

**10** To the extent *Aranda* "require[d] the exclusion of relevant evidence that need not be excluded under federal constitutional law, it was abrogated in 1982 by the 'truth-in-evidence' provision of Proposition 8." (*People v. Fletcher* (1996) 13 Cal.4th 451, 465.)

41

said, "Yes, I did," and that she talked to defendant three days after her conversation with her source. Asked by the prosecutor how she had begun the conversation, Santos replied: "I asked him, 'Is it true? Did you really kill someone with a belt?' " The prosecutor asked to approach the bench.

At the bench, the prosecutor told the court he expected Santos would testify that defendant responded to her question by asking, "Did Mike [Drebert] tell you that?" The prosecutor argued that because it was defendant himself who brought Drebert into the conversation "there is no *Aranda* problem." The court allowed the prosecutor to proceed with the questioning. Santos testified that, in response to her question, defendant eventually said, "That pussy Mike told you, huh?" whereupon she denied Drebert was her source. When she asked defendant why he had done it, he changed the subject. Later that evening, however, she again asked him whether he killed someone with a belt. He admitted he had and described the murder of Koen Witters in great detail.

Defendant contends the trial court violated the *Aranda/Bruton* rule by allowing the prosecutor to ask Santos whether the source of her information was a civilian with personal knowledge of the murder. He also claims the violation was compounded when Santos was permitted to testify about defendant's response—"Mike told you, huh?"— when she asked if he had committed the murder.

The *Aranda/Bruton* rule addresses a specific issue that arises at joint trials when the prosecution seeks to admit the out-of-court statement of a nontestifying defendant that incriminates a codefendant. As we have observed, " '*Aranda* and *Bruton* stand for the proposition that a "nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant is generally unreliable and hence inadmissible as violative of that defendant's right of confrontation and cross-examination, even if a limiting instruction is given." [Citation.]' [Citation.] The United States Supreme Court 'limited the scope of the *Bruton* rule in *Richardson v. Marsh* (1987) 481 U.S. 200 . . . . The court explained that *Bruton* recognized a narrow exception to the general rule that

42

juries are presumed to follow limiting instructions, and this narrow exception should not apply to confessions that are not incriminating on their face, but become so only when linked with other evidence introduced at trial. (*Richardson*, *supra*, at pp. 206–207.)' " (*People v. Homick* (2012) 55 Cal.4th 816, 874, fn. omitted; see *People v. Fletcher, supra,* 13 Cal.4th 451, 463–464.) The high court went on to hold in *Richardson* that admission of a nontestifying codefendant's confession against the defendant does not violate the defendant's confrontation right if the confession is redacted to eliminate not only the defendant's name but any reference to his existence. (*Richardson, supra*, at p. 211.) "When, despite redaction, the statement obviously refers directly to the defendant, and involves inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial, the *Bruton* rule applies and introduction of the statement at a joint trial violates the defendant's rights under the confrontation clause." (*People v. Burney, supra,* 47 Cal.4th at p. 231.)

This case does not present a conventional *Bruton* issue because the prosecution was not attempting to directly introduce codefendant Drebert's confession at a joint trial before the same jury. Separate juries had been impanelled precisely to avoid such a problem. (See *Gray v. Maryland* (1998) 523 U.S. 185, 194–195 [because the use of an accomplice's confession "creates a special, and vital, need for cross-examination," a prosecutor desiring to offer such evidence must comply with *Bruton,* hold separate trials, use separate juries or abandon the use of the confession].) Rather, the question is whether defendant's confrontation right was violated by the manner in which the prosecution sought to explain Santos's knowledge of the murder, resulting in introducing defendant's admissions to her.

Defendant argues the prosecution had no valid reason to identify the source of Santos's knowledge at all except to invite the jury to make the connection to Drebert. That is a relevance objection he could have made at trial, but did not. The resolution of the *Bruton* claim before us requires a determination whether the court improperly

43

admitted a statement by Drebert inculpating defendant. It did not. Santos never testified that Drebert told her defendant killed Witters; in fact, her testimony included her denials to defendant that Drebert was the source. The jury heard that Santos had a conversation with someone who had been present at a murder, and she later asked defendant whether it was true he had killed someone with a belt. The testimony *implied* that the unknown person told her defendant killed someone with a belt. Statements that incriminate by implication, however, are not within the scope of *Bruton*. (*People v. Fletcher*, *supra,* 13 Cal.4th at p. 463.) Moreover, the challenged testimony is reasonably viewed as explaining the basis for Santos's questions to defendant and to give context to his responses. Introduction of Santos's testimony, including recounting defendant's accusations that "Mike" must have told her, did not "pose[] a substantial threat to [defendant's] right to confront the witnesses against him." (*Bruton v. United States*, *supra*, 391 U.S. at p. 137.) Accordingly, his rights were not violated.

### 3. Asserted Violation of Constitutional Right to Confrontation

Citing *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), defendant contends the trial court violated his Sixth Amendment confrontation rights when it admitted (1) an expert witness's testimony about DNA testing the witness herself did not conduct; and (2) testimony regarding the autopsy of Koen Witters by a pathologist who did not conduct the autopsy. We need not decide whether the challenged DNA evidence was erroneously admitted. Any error was harmless because, in addition to testifying to her colleague's DNA testing, the expert conducted and testified about her own testing that was consistent with her colleague's results. Similarly, even if we assumed error in the admission the autopsy report, such error is harmless. (*People v. Dungo* (2012) 55 Cal.4th 608; *People v. Edwards, supra,* 57 Cal.4th 658.)

44

*a. DNA Evidence*

*1. Background*

Anjali Swienton, a forensic DNA analyst with Cellmark Diagnostics, testified about DNA testing pertaining to the sexual assault of J.S. DNA was extracted from blood samples provided by J.S., defendant, Drebert, Pritchard and Vera and then compared to DNA extracted from oral and vaginal swabs taken from J.S. following the sexual assault on her. Swienton explained that the type of DNA testing performed in this case is called polymerase chain reaction (PCR). The PCR test allows the analyst to identify certain points along a DNA chain and then compare those between known samples and samples obtained from a crime scene or victim. There are three steps to PCR testing. DNA is extracted from the known and the unknown samples and then the DNA is amplified, a process Swienton described as making a "genetic Xerox" of the DNA. After amplification comes the "typing step," in which comparisons are made between DNA profiles generated from known and unknown samples. Swienton explained there are two different typing processes within PCR technology, the DQ-alpha/polymarker test and the short tandem repeats test (STR). The DQ-alpha/polymarker test uses six sites along the DNA chain as a basis of comparison among the samples provided to the analyst. The STR test uses three sites and also allows the analyst to determine the gender of the donor of the sample being tested.

In this case, both the DQ-alpha/polymarker test and the STR test were conducted, the former by a Cellmark analyst named Lisa Grossweiler and the latter by Swienton herself. Grossweiler's tests revealed that defendant could not be excluded as a donor of the DNA present on a vaginal swab taken from J.S. after she was raped. Swienton's later STR test revealed that defendant's DNA was consistent with the DNA from the vaginal swab. On cross-examination, Swienton testified that the frequency of the STR marker combination obtained from the vaginal swab was 1 in 1,300 for the Caucasian population and 1 in 2,700 for the Latino population.

## 2. *Discussion*

Defendant contends his confrontation rights were violated by Swienton's testimony regarding the DQ-alpha/polymarker test conducted by Grossweiler. "The Sixth Amendment to the federal Constitution guarantees a defendant's right to confront adverse witnesses. [Citation.] In addition, the prosecution may not rely on 'testimonial' out-of-court statements unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. (*Crawford, supra,* 541 U.S. at p. 59 . . . .)" (*People v. Harris* (2013) 57 Cal.4th 804, 839–840.) At the outset, the Attorney General contends defendant forfeited this claim by failing to object at trial. We have rejected this assertion, noting that, because *Crawford* was "a dramatic departure from prior confrontation clause case law," a defendant's failure to object is excusable in cases like this one where the trial occurred long before *Crawford* was decided "because defense counsel could not reasonably have been expected to anticipate this change in the law." (*Harris,* at p. 840.)

In *Williams v. Illinois* (2012) 567 U.S. ___ [183 L.Ed.2d 89, 132 S.Ct. 2221], the United States Supreme Court considered whether the defendant's confrontation rights were violated when an Illinois State Police forensic biologist testified that a DNA profile generated by a Maryland laboratory from vaginal swabs taken from a rape victim matched a DNA profile generated by the Illinois State Police Laboratory from a sample of the defendant's blood. A four-judge plurality opinion "concluded on two alternative grounds that [the] expert testimony did not violate the federal Constitution's confrontation right. First, the plurality reasoned that [the expert's] testimony was constitutionally permissible because it was admitted not for its truth but only for the limited purpose of explaining the basis of [her] independent conclusion, based on her expertise, that the defendant's DNA matched the DNA in the semen found on the vaginal swabs. [Citation.] Alternatively, the *Williams* plurality reasoned, there was no confrontation right violation because the Maryland laboratory's report was prepared for

46

the primary purpose of finding a dangerous rapist who was still at large, not 'for the primary purpose of accusing a targeted individual.' [Citation.] In a separate concurring opinion, Justice Thomas agreed with the plurality's conclusion that [the] expert testimony did not offend the Sixth Amendment's confrontation right, but for a completely different reason: The Maryland laboratory report on which [the expert] relied 'lack[ed] the solemnity of an affidavit or deposition' and was therefore not 'testimonial.' [Citation.] A dissenting opinion by Justice Kagan, and signed by Justices Scalia, Ginsburg, and Sotomayor, disagreed with the reasoning of both the plurality and Justice Thomas, and concluded that [the expert's] testimony violated the defendant's confrontation right. These widely divergent views, none of which was able to garner majority support—as reflected in the four-one-four decision—highlight the complexity of the issue." (*People v. Dungo, supra,* 55 Cal.4th at p. 618.)

We need not wade further into the complexities of the issue here because Swienton properly testified that she, personally, performed one of the tests on the vaginal swab. Like the DQ-alpha/polymarker test results, the STR test showed defendant's DNA was consistent with and did not exclude defendant as a donor of the material on the vaginal swab.

Even if we assumed it was error for Swienton to have also testified regarding the results of Grossweiler's DQ-alpha/polymarker test, we would find the error harmless.

" ' "Confrontation clause violations are subject to federal harmless-error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24." [Citation.] We ask whether it is clear beyond a reasonable doubt that a rational jury would have reached the same verdict absent the error.' [Citation.]" (*People v. Livingston* (2012) 53 Cal.4th 1145, 1159; see *Neder v. United States* (1999) 527 U.S. 1, 18.) Swienton's testimony about her own DNA test results, combined with testimony from J.S. that identified defendant's protégés, Pritchard and Vera, as two of the four men who invaded her residence, and her testimony that the man who raped her appeared to be their leader and that he ejaculated into her

47

vagina, along with Santos's testimony that defendant gave her property matching the description of property stolen from the J.S/E.G. residence, including their answering machine, provided abundant evidence of defendant's guilt, quite apart from the additional evidence of the DQ-alpha/polymarker results.

Accordingly, any assumed error was harmless beyond a reasonable doubt.

### b. Autopsy Evidence

#### 1. Background

The autopsy on Koen Witters was performed by Dr. Shayla Frisby, a pathology fellow at the Los Angeles County coroner's department. Dr. Frisby produced a 14-page autopsy report. Such reports document the pathologist's observations of the condition of the decedent's body, including internal and external injuries, and provide conclusions regarding the cause of death. The report is prepared at or about the time the autopsy is performed. Additionally, the body is photographed before the autopsy and additional photographs may be taken during the autopsy. Such photographs were taken in this case.

At the time of defendant's trial, Dr. Frisby no longer lived in Los Angeles County. In her place, the prosecution called Dr. Eugene Carpenter, a medical examiner with the coroner's office. Dr. Carpenter reviewed Dr. Frisby's autopsy report and the photographs taken of Koen Witters's body. Based on his review of that material, he testified about the injuries to Witters and opined that the cause of death was strangulation. The autopsy report was subsequently admitted into evidence.

#### 2. Discussion

Defendant contends the trial court violated his confrontation rights by admitting the autopsy report prepared by a nontestifying pathologist. The Attorney General argues the claim is forfeited because it was not asserted below. For the same reason we rejected the forfeiture argument with respect to the DNA evidence, we reject it here. (*People v. Edwards, supra,* 57 Cal.4th at p. 704.)

48

Nonetheless, though not forfeited, any error in the admission of the autopsy report was harmless. In *People v. Dungo, supra,* 55 Cal.4th 608, we held that statements in an autopsy report describing a nontestifying pathologist's observations of the condition of the victim's body are not testimonial because the primary purpose of recording such facts does not pertain to a criminal investigation. (*Dungo, supra,* at p. 619; *id.* at p. 622 (conc. opn. of Werdegar, J.); accord, *People v. Edwards, supra,* 57 Cal.4th at pp. 704–707.) Therefore, we concluded that testimony by a pathologist based on the report (including photographs) prepared by the nontestifying pathologist did not violate the defendant's confrontation clause rights even though he was unable to confront and cross-examine the nontestifying pathologist. (*Dungo*, *supra*, at p. 621.) In *Dungo* the autopsy report was not admitted into evidence and thus we did not have to decide whether the entire report was testimonial in nature. (*Id.* at pp. 618–619.) Nor do we need to decide that issue in this case, even though the autopsy report was admitted. As was true in *Dungo,* Dr. Carpenter's attribution of cause of death was based on his own independent assessment of the material he reviewed and his testimony, therefore, did not encroach upon defendant's confrontation clause rights. Moreover, there was no dispute as to his cause of death opinion. Accordingly, even if we assume error in the admission of the autopsy report, any error was harmless beyond a reasonable doubt.

### 4. Asserted Instructional Errors

#### a. Absence of Instruction to Consider Separately the Evidence Regarding Each Count

Defendant contends the trial court erred by failing to instruct the jury, sua sponte, to consider only the evidence pertaining to each count when considering defendant's guilt of the particular count. The claim is both forfeited and meritless.

Pursuant to CALJIC No. 17.02, the jury was instructed as follows: "Each Count charges a distinct crime. You must decide each Count separately. The defendant may be found guilty or not guilty of any or all the crimes charged. Your finding as to each Count

49

must be stated in a separate verdict." The instruction was legally correct; to the extent defendant contends the trial court should have done more, he "failed . . . to propose a modification of CALJIC No. 17.02, or to propose an additional instruction, thus forfeiting the claim of instructional error." (*People v. Geier, supra,* 41 Cal.4th at p. 579.)

Even were we to find this claim was preserved, it fails on the merits. The premise of defendant's argument—the instruction was required because none of the evidence was cross-admissible—is erroneous, as we pointed out in rejecting his severance claim. Therefore, even had defendant requested such an instruction, it would have been properly refused. (*People v. Geier, supra*, 41 Cal.4th at pp. 578–579.)

### b. Instructions Concerning Circumstantial Evidence

Defendant contends that certain standard instructions given at his trial undermined the requirement of proof beyond a reasonable doubt, impermissibly lightened the prosecution's burden of proof, and denied him his rights to trial by jury, to due process and to a reliable capital trial.[11] The instructions in question are CALJIC Nos. 2.01 (sufficiency of circumstantial evidence) and 2.02 (sufficiency of circumstantial evidence to prove specific intent or mental state). Defendant points to the following language that appears in both instructions: "If . . . one interpretation of [the circumstantial evidence] appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable." He argues this

---

[11]     The Attorney General contends defendant forfeited any objection to these instructions because he failed to object to them in the trial court. Where, however, defendant asserts that an instruction is incorrect in law an objection is not required. (*People v. Smithey* (1999) 20 Cal.4th 936, 976–977, fn. 7; § 1259 ["The appellate court may . . . review any instruction given, . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."].) We apply this principle to all such instructional claims except to those where we explicitly conclude that defendant's failure to seek modification or clarification of an otherwise correct instruction resulted in forfeiture.

language allowed the jury to convict him if it found an incriminatory interpretation reasonable even if guilt was not established beyond a reasonable doubt. He also argues the instruction created an impermissible mandatory presumption "that required the jury to accept any reasonable incriminatory interpretation of the circumstantial evidence unless [defendant] rebutted the presumption by producing a reasonable exculpatory interpretation."

"We have previously rejected each of the claims that defendant makes, and we decline to reconsider these decisions. Contrary to defendant's arguments, CALJIC Nos. 2.01 [and] 2.02 . . . , which direct the jury to accept reasonable inferences and to reject unreasonable ones, do not permit the jury to base a determination of guilt on something less than proof beyond a reasonable doubt." (*People v. Jurado* (2006) 38 Cal.4th 72, 126–127.) Nor do they create a mandatory presumption of guilt in cases in which a reasonable interpretation of evidence points toward guilt. (*People v. Nakahara* (2003) 30 Cal.4th 705, 714; *People v. Crittenden* (1994) 9 Cal.4th 83, 144.)

### c. Asserted "Dilution" of the Reasonable Doubt Standard

Defendant points to five other standard instructions that he asserts individually and collectively diluted the constitutionally mandated reasonable doubt standard: CALJIC Nos. 1.00 (the respective duties of the judge and jury), 2.21.1 (discrepancies in testimony), 2.21.2 (willfully false witnesses), 2.22 (weighing conflicting testimony), and 2.27 (the sufficiency of evidence of one witness). He maintains the instructions, by directing the jury to decide material issues by determining which side presented relatively stronger evidence, implicitly replaced the reasonable doubt standard with a preponderance of the evidence standard.

Again, we have repeatedly rejected the same challenges to these instructions. (*People v. Jones, supra,* 57 Cal.4th 899, 972–973; *People v. Vines* (2011) 51 Cal.4th 830, 885 ["we have previously considered and rejected the argument that these instructions

51

improperly dilute the constitutional requirement that guilt be proven beyond a reasonable doubt"]; *People v. Kelly* (2007) 42 Cal.4th 763, 792 ["Each of these instructions 'is unobjectionable when, as here, it is accompanied by the usual instructions on reasonable doubt, the presumption of innocence, and the People's burden of proof.' "]; *People v. Crew* (2003) 31 Cal.4th 822, 848 [use of the word "innocence" in CALJIC Nos. 1.00 and 2.00 "mean[s] evidence less than that required to establish guilt, not [that] defendant must establish innocence or that the prosecution has any burden other than proof beyond a reasonable doubt"].) We find nothing in defendant's arguments to warrant reconsideration of our past decisions.

### d. Instruction Concerning Motive

The jury was instructed with CALJIC No. 2.51, on motive, as follows: "Motive is not an element of any of the crimes charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish the defendant is guilty. Absence of motive may tend to show the defendant is not guilty." Defendant contends this instruction allowed the jury to convict him based on the presence of motive alone and thereby lessened the prosecution's burden of proof beyond a reasonable doubt. We have previously rejected this claim. (*People v. Jones, supra,* 57 Cal.4th at p. 971.) We do so again here.

### e. Instruction Concerning Possession of Recently Stolen Property

The jury was instructed with CALJIC No. 2.15, regarding a defendant's possession of recently stolen property, as follows: "If you find that the defendant was in conscious possession of recently stolen property, the fact of that possession is not by itself sufficient to permit an inference that the defendant is guilty of robbery, home invasion robbery in concert, or carjacking. Before guilt may be inferred, there must be corroborating evidence tending to prove defendant's guilt. However, this corroborating evidence need only be slight, and need not by itself be sufficient to warrant an inference

of guilt. [¶] As corroboration, you may consider the attributes of possession—time, place and manner, that the defendant had an opportunity to commit the crime charged, the defendant's conduct, or any other evidence which tends to connect the defendant with the crime charged."

Defendant contends this instruction unconstitutionally lightened the prosecution's burden of proof in that it created an improper permissive inference and also because it permits only "slight corroboration" to establish guilt. He argues further the instruction allowed the jury to use evidence of his possession of the stolen property as to one crime to convict him of other crimes as to which he was not in possession of such property; specifically, he claims the jury could have used evidence of his possession of property from Martinez to convict him of the murder of Witters, from which crime scene no property was recovered. Finally, he also argues the evidence was insufficient to support the instruction.

We have previously rejected the claim that the instruction creates either a mandatory or a permissive presumption that lowers the prosecution's burden of proof. (*People v. Gamache* (2010) 48 Cal.4th 347, 374–376; *People v. Parson* (2008) 44 Cal.4th 332, 355–356.) Regarding defendant's second point, the instruction by its terms was clearly limited to the theft-related offenses—robbery, home invasion, robbery in concert and carjacking—and not the murder count or the special circumstances. We presume the jurors understood and followed the court's instructions. (*People v. Homick, supra,* 55 Cal.4th at p. 867.) Finally, there was more than sufficient evidence to support the instruction in light of Gladys Santos's testimony that defendant gave her an answering machine later matched by its serial number to an answering machine stolen from J.S. and E.G., and gave her jewelry that was later determined to belong to Ruth Weir. The police also found items belonging to Michael Martinez in Santos's apartment, where defendant was arrested.

53

*f. Instruction Concerning Juror Misconduct*

The jury was instructed with CALJIC No. 17.41.1, regarding jury deliberations, as follows: "The integrity of a trial requires that jurors, at all times during their deliberations, conduct themselves as required by these instructions. Accordingly, should it occur that any juror refuses to deliberate or expresses an intention to disregard the law or to decide the case based on penalty or punishment or any other improper basis, it is the obligation of the other jurors to immediately advise the Court of the situation."

In *People v. Engelman* (2002) 28 Cal.4th 436, 439-440, 449, we rejected the defendant's argument that the giving of this instruction was error or violated his state or federal constitutional rights. "Nonetheless, [because] we believe[d] that CALJIC No. 17.41.1 create[d] a risk to the proper functioning of jury deliberations and that it is unnecessary and inadvisable to incur this risk[,] . . . in the exercise of our supervisory power [citations], we direct[ed] that CALJIC No. 17.41.1 not be given in trials conducted in the future." (*Id.* at p. 449.) Defendant acknowledges our holding and raises the issue to preserve it for federal review. While he also suggests that in his case the instruction actually abridged his right to a fair trial, "he [cites nothing] in the record indicating the jurors in his case were improperly influenced by the instruction in their deliberations." (*People v. Brown* (2004) 33 Cal.4th 382, 393.)

*g. Instruction Concerning Felony Murder; Deficiency in the Information*

Defendant raises another claim we have repeatedly rejected. He "contends the trial court erred in instructing the jury on first degree murder because the information charged him only with one count of murder in violation of section 187, subdivision (a). He characterizes that provision as a statute defining second degree murder. Because, according to defendant, the information charged only second degree murder, the trial court lacked jurisdiction to try him for first degree murder. Defendant's argument is premised on his reading of *People v. Dillon* (1983) 34 Cal.3d 441. The argument is a familiar one that we have rejected many times. We do so again for the reasons

54

previously expressed.  [Citations.]  [¶]  Defendant also contends the information failed to allege all the facts necessary to subject him to punishment for first degree murder, including the death penalty, rendering his conviction defective under *Apprendi v. New Jersey* (2000) 530 U.S. 466, 476 . . . .  As we [have] stated . . . :  'The *Apprendi* claim is illusory; the information included special circumstance allegations that fully supported the penalty verdict.' "  (*People v. DeHoyos* (2013) 57 Cal.4th 79, 143–144.)

### h. Instruction Concerning the Reasonable Doubt Standard

Defendant contends that CALJIC No. 2.90, the standard instruction defining reasonable doubt given in this case, is constitutionally defective and violated his federal due process rights.  His claim is meritless.  As given here, CALJIC No. 2.90 stated:  "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty.  The presumption places upon the People the burden of proving him guilty beyond a reasonable doubt.  [¶]  Reasonable doubt is defined as follows:  It is not a mere possible doubt, because everything relating to human affairs is open to some possible or imaginary doubt.  It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge."[12]

"Tracking the language of section 1096, the standard instructions describe the presumption of innocence and the requirement of proof beyond a reasonable doubt, and provide the legislatively approved definition of reasonable doubt.  A court satisfies its

---

[12]   This version of CALJIC No. 2.90 was the post-1994 version omitting the phrase "moral certainty" criticized by the United States Supreme Court in *Victor v. Nebraska* (1994) 511 U.S. 1, 16–17.  Although the high court upheld the constitutionality of the earlier version of the instruction, "moral certainty" was removed.  (See *People v. Whisenhunt* (2008) 44 Cal.4th 174, 221, fn. 13.)

statutory obligation to instruct on these principles by giving CALJIC No. 2.90 . . . ." (*People v. Aranda* (2012) 55 Cal.4th 342, 353, fn. omitted.)  The constitutionality of CALJIC No. 2.90 has been " 'conclusively settled.' " (*People v. Whisenhunt, supra,* 44 Cal.4th at p. 221.)

Defendant asserts that CALJIC No. 2.90 required the jurors to articulate a reason for their doubts.  As defendant concedes, the instruction contains no such requirement.  Thus, CALJIC No. 2.90 is distinguishable from the reasonable doubt instruction condemned in *People v. Antommarchi* (N.Y. 1992) 604 N.E.2d 95, upon which defendant principally relies.  There the jury was instructed that a reasonable doubt " 'is a doubt for which a juror can give a reason if he or she is called upon to do so in the jury room,' " and " '[i]t must be a doubt based upon the evidence or the lack of evidence in this case.' " (*Id.* at p. 97.)  Such an instruction, the New York court concluded, reversed the burden of proof. (*Id.* at p. 98.)  Neither expressly nor by implication does CALJIC No. 2.90 suffer from this deficiency.

Next, defendant contends that the language of the instruction informing the jury that reasonable doubt is not mere possible doubt was unconstitutional because it failed to adequately limit the scope of possible doubt.  This language was expressly found constitutional in *Victor v. Nebraska, supra,* 511 U.S. 1, 17.  We reject the claim.

In a pair of related claims defendant complains that the instruction failed to inform the jury the presumption of innocence continued throughout the trial.  We have previously rejected a similar claim.  (*People v. Lewis* (2001) 25 Cal.4th 610, 651–652.) We do so again here.

Finally, defendant faults the instruction for failing to affirmatively inform the jury that (1) he had no obligation to present or refute evidence; (2) any defense evidence he did produce did not shift the burden of proof; and (3) a conflict in the evidence or a lack of evidence could give rise to a reasonable doubt.  CALJIC No. 2.90 clearly places upon the state the burden of proof beyond a reasonable doubt.  "We presume the jury

understood and followed the instruction." (*People v. Homick, supra,* 55 Cal.4th at p. 873.) There is no reasonable likelihood the jury would have applied the instruction in a way that would have shifted or diluted the burden of proof. (*Jones v. United States* (1999) 527 U.S. 373, 390.)

Accordingly, we reject defendant's challenges to CALJIC No. 2.90.

### 5. *Effects of Asserted Guilt Phase Errors*

Defendant claims cumulative prejudice arising from the asserted guilt phase errors requires reversal. In three instances we have assumed error—the trial court's apparent ruling that the criminal conduct underlying Gladys Santos's misdemeanor convictions could be established only by third party testimony (*ante,* at p. 37), Anjali Swienton's testimony about the results of DNA testing she did not personally conduct (*ante,* at p. 46), and the admission of the autopsy report (*ante*, at pp. 47–48)—but found each to be harmless under the applicable standard. Apart from these three instances, we have found no error. Considering their cumulative effect, the assumed errors furnish no basis for reversal of the judgment. (*People v. Homick, supra,* 55 Cal.4th at p. 884.)

## D. **Challenges to the Death Penalty Statutes and Instructions**

### 1. *Proportionality*

Defendant contends his death sentence violates the proportionality requirement of the Eighth Amendment to the federal Constitution and international law because the death penalty was imposed on him without a finding he intended to kill or acted with reckless indifference to human life. We have previously considered and rejected the Eighth Amendment claim and, in the absence of a persuasive argument why our precedents are in error, do so again. (*People v. Letner and Tobin, supra,* 50 Cal.4th at pp. 191–194; *People v. Smithey, supra,* 20 Cal.4th at pp. 1016–1017.)

We have also repeatedly rejected defendant's claim that the death penalty statute violates international norms generally or, specifically, the International Covenant on Civil

and Political Rights.  (*People v. Turner* (2004) 34 Cal.4th 406, 439–440; *People v. Brown, supra,* 33 Cal.4th at pp. 403–404.)  Because defendant fails to explain why our precedents on this issue should no longer be followed, we reject this claim as well.

### 2.  *Other Constitutional Challenges to the Death Penalty Statue*

Defendant contends California's death penalty statute and accompanying instructions are constitutionally invalid in numerous respects.  We have repeatedly rejected similar claims, and, in the absence of a persuasive argument why our precedents are in error, do so again here as follows:

"The death penalty statute does not lack safeguards to avoid arbitrary and capricious sentencing, deprive defendant of the right to a jury trial, or constitute cruel and unusual punishment on the ground that it does not require either unanimity as to the truth of aggravating circumstances or findings beyond a reasonable doubt that an aggravating circumstance (other than § 190.3, factor (b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence. . . .  'Written findings by the jury during the penalty phase are not constitutionally required, and their absence does not deprive defendant of meaningful appellate review.' "  (*People v. Maciel* (2013) 57 Cal.4th 482, 553; see *People v. Hayes* (1990) 52 Cal.3d 577, 643 ["Because the determination of penalty is essentially moral and normative [citation], and therefore different in kind from the determination of guilt, there is no burden of proof or burden of persuasion."].)

"The death penalty statute is not deficient because it does not require that the jury be instructed on the presumption of life, nor was there any error because the jury was not so instructed."  (*People v. Homick, supra,* 55 Cal.4th at p. 904.)

Nor is CALJIC No. 8.88 unconstitutional because (1) the instruction's use of the phrase "so substantial" is impermissibly vague; (2) the instruction's use of the term "warrants" is so overbroad it misleads the jury to believe it may impose the death penalty

even when it concludes it is not the appropriate remedy; (3) the instruction fails to inform the jury that if the mitigating factors outweighed those in aggravation it must return a sentence of life without possibility of parole; or (4) the instruction fails to inform the jury that defendant did not have to persuade them that death was not the appropriate penalty. (*People v. Linton, supra,* 56 Cal.4th at p. 1211; *People v. Duenas* (2013) 55 Cal.4th 1, 27; *People v. Boyette* (2002) 29 Cal.4th 381, 464–465; see *People v. Hayes, supra,* 52 Cal.3d at p. 643.)

"The failure to require intercase proportionality does not guarantee ' "arbitrary, discriminatory, or disproportionate impositions of the death penalty." ' . . . [¶] Defendant contends that his death sentence violates international law and therefore his rights under the Eighth and Fourteenth Amendments to the federal Constitution. Defendant points to no authority that 'prohibit[s] a sentence of death rendered in accordance with state and federal constitutional and statutory requirements.' " (*People v. Edwards, supra,* 57 Cal.4th at p. 768.)

### E. Noncapital Sentencing Claims

#### 1. Asserted Error Under Cunningham v. California

Defendant contends the trial court violated his Sixth and Fourteenth Amendment right to a jury trial when it sentenced him to the upper terms on the noncapital counts of which he was convicted as well as on the firearm use allegations in connection with those counts.

In *Cunningham v. California* (2007) 549 U.S. 270, the United States Supreme Court, applying its earlier decisions in *Apprendi v. New Jersey, supra,* 530 U.S. 466 (*Apprendi*) and *Blakely v. Washington* (2004) 542 U.S. 296, held that California's "determinate sentencing law did not comport with a defendant's Sixth Amendment jury trial right. As *Cunningham* explained, 'If the jury's verdict alone does not authorize the sentence, if, instead, the judge must find an additional fact to impose the longer term, the

Sixth Amendment requirement is not satisfied.' [Citation.] Because the aggravating circumstances necessary for imposition of an upper term 'depend on facts found discretely and solely by the judge' [citation], the 'statutory maximum' prescribed in California's sentencing scheme is not the upper term but rather the middle term [citation]. [¶] Decisions by this court have further clarified the interplay between Sixth Amendment requirements and our determinate sentencing scheme. *People v. Black* (2007) 41 Cal.4th 799 held in relevant part that imposition of the upper term does not violate a defendant's jury trial right 'so long as one legally sufficient aggravating circumstance has been found to exist by the jury,' or 'has been admitted by the defendant.' [Citation.] A companion case, *People v. Sandoval* [(2007)] 41 Cal.4th 825 . . . , established that the erroneous imposition of an upper term is subject to federal harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18." (*People v. Myles* (2012) 53 Cal.4th 1181, 1220-1221.)

In this case, the trial court imposed the upper term for counts 2 (§ 459; burglary), 3 (§ 211; robbery of Koen Witters), 4 (§ 211/213, subd. (a)(1)(A); robbery in concert of J.S.), 5 (§ 211/213, subd. (a)(1)(A); robbery in concert of E.G.), 6 (§ 288a, subd. (d); forcible oral copulation in concert of J.S.), 7 (§ 288a, subd. (d); forcible oral copulation in concert of J.S.), 8 (§ 261.1; forcible rape in concert of J.S.), 10 (§ 215, subd. (a); carjacking of J.S. and E.G.), 12 (§ 211; robbery of Ruth Weir), 13 (§ 211; robbery of Patrick Weir), 14 (§ 215, subd. (a); carjacking of Ruth Weir), and 16 (§ 211; robbery of Michael Martinez). As to count 9 (§ 261.1; forcible rape in concert of J.S.), defendant was sentenced to 25 years to life, pursuant to section 667.61, the jury having found true the specified circumstances that the offense was committed while defendant was engaged in the commission of a burglary and that the victim was tied or bound during the commission of the offense. (§ 667.61, subd. (e)(2), (5).)

The trial court also selected the upper term for all firearm use enhancements. (§ 12022.5, subd. (a).)

60

The trial court indicated it had selected the upper term for the substantive offenses because "each crime was, in the court's view, planned and premeditated. Each of the victims was particularly vulnerable, and they were surprised and outnumbered by [defendant] and [his] associates. They were imprisoned, essentially, in their own homes. They were bound, and in some cases, gagged. Further [defendant] occupied a position of leadership, that [he] induced minors to participate in each of these crimes, that [he had] served at least one prior prison term, and that [he was] on parole from the state prison at the time" the crimes were committed.

The court gave as its reasons for selecting the upper term for the firearm use enhancements that the "use of this firearm was planned and premeditated, and the manner in which [defendant] chose to use this firearm showed a high degree of viciousness, callousness and cruelty."

Ultimately, only the upper terms for count 4 and the firearm use enhancements alleged in connection with counts 4 and 9 were actually imposed. The sentences on the remaining counts (5, 10, 12, 13, 14, and 16) were recalculated to one-third the midterm and made consecutive to count 4.

Among the reasons given by the trial court for imposing the upper term on count 4 was defendant's criminal history, which included at least one prison term and the fact he was on parole when he committed the offenses. Defendant's pattern of recidivism as evidenced by this criminal history constitutes a legally sufficient circumstance in aggravation justifying imposition of the upper term without violating his Sixth Amendment right to a jury trial. (*People v. Black, supra,* 41 Cal.4th at pp. 818–820 [recidivism exception to *Apprendi-Blakely-Cunningham* line of authority "include[s] not only the fact that a prior conviction occurred, but also other related issues that may be determined by examining the records of the prior convictions" (*Black, supra,* at p. 819)]; see *People v. Thomas* (2001) 91 Cal.App.4th 212, 220-223 [the exception recognized in

61

*Apprendi* for " 'the fact of a prior conviction' " (*Thomas, supra,* at p. 220) permits a trial court to decide whether a defendant has served a prior prison term].)

With respect to imposition of the upper term for the firearm use enhancements (§ 12022.5, subd. (a)) on counts 4 and 9, among the reasons given by the trial court was that the use of the firearms in each case was planned and premeditated. The evidence related to those two counts, both of which involved J.S. and E.G., shows that defendants and his cohorts arrived at the victims' residence already armed with guns and used them to threaten and subdue the victims. Given this evidence, we conclude the jury would "unquestionably" have found true this aggravating circumstance had it been submitted to it, thus rendering any *Cunningham* error harmless beyond a reasonable doubt. (*Sandoval, supra,* 41 Cal.4th at p. 839.)

To the extent defendant challenges on constitutional grounds the trial court's decision to impose consecutive sentences on counts 5, 10, 12, 13, 14 and 16, that contention is foreclosed by the high court's decision in *Oregon v. Ice* (2009) 555 U.S. 160 (*Apprendi* line of decisions does not apply to factual findings that bear on the question of whether multiple sentences are to be imposed consecutively or concurrently). (See *People v. Black, supra,* 41 Cal.4th at p. 821 [trial court's imposition of consecutive sentences does not violate a defendant's Sixth Amend. right to jury trial].)

*2. Assertedly Improper Consecutive Sentences for Carjacking and Robbery*

Defendant contends the trial court violated section 654 by sentencing him to consecutive sentences on the robbery and carjacking counts involving E.G. and J.S. (counts 4, 5 and 10) and the Weirs (counts 12 and 14). Defendant argues here, as he did in the trial court, that in each incident the carjacking and robbery were part of a single transaction and, therefore, he could be punished only once for these offenses. He contends his sentences on the carjacking counts—counts 10 and 14—should have been stayed. We reject the claim.

62

As relevant here, at sentencing, the trial court selected count 4 (robbery in concert of J.S.; § 211/213, subd. (a)(1)(A)) as the principal term and sentenced defendant to nine years plus the upper term of 10 years for the firearm use enhancement (§ 12022.5). The sentences on all remaining relevant counts were to be served consecutive to the sentence on count 4. On count 5 (robbery in concert of E.G.), defendant was sentenced to three years four months, and on count 10 (carjacking of J.S. and E.G.), to three years.[13] On count 12 (robbery in concert of Ruth Weir), defendant was sentenced to one year four months; on count 13 (robbery in concert of Patrick Weir), to one year four months; and on count 14 (carjacking of Ruth Weir), to one year eight months.

Defendant does not advance a section 654 challenge to the multiple sentences imposed on the four robbery counts; his quarrel is with the consecutive sentences on the carjacking counts.

Section 654 states in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (See § 215, subd. (c) [specifically prohibiting punishment for a carjacking and a robbery that are "the same act"].) " 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be

---

[13]     Defendant had been charged with a separate count (count 11) of carjacking against J.S., but that count was dismissed pursuant to defendant's motion under section 1118.1, and the prosecution was permitted to amend count 10 to add J.S. In sentencing defendant, however, and for reasons not apparent on the record, the trial court did not impose a separate sentence on the carjacking count as to J.S.

punished for any one of such offenses but not for more than one.' " (*People v. Rodriguez* (2009) 47 Cal.4th 501, 507, italics omitted.)

"[T]he purpose of section 654 'is to insure that a defendant's punishment will be commensurate with his culpability.' " (*People v. Latimer* (1993) 5 Cal.4th 1203, 1211.) "It is [the] defendant's intent and objective, not temporal proximity of his offenses, which determine whether the transaction is indivisible." (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) " 'The defendant's intent and objectives are factual questions for the trial court; [to permit multiple punishments,] there must be evidence to support [the] finding the defendant formed a separate intent and objective for each offense for which he was sentenced.' " (*People v. Coleman* (1989) 48 Cal.3d 112, 162.)[14]

In this case, defendant was convicted of two distinct offenses in the E.G/J.S. and Weir incidents, home invasion robbery and carjacking. With respect to home invasion robbery, the jury was instructed, and required to find, that defendant, "acting in concert with two or more other persons, commit[ted] [a] robbery within an inhabited dwelling house . . . ." (§ 213, subd. (a)(1)(A).) Thus, this was not mere robbery, but robbery involving the particular circumstances of multiple perpetrators and the invasion of the victims' home.

" ' "Carjacking" is the felonious taking of a motor vehicle in the possession of another, from his or her person or immediate presence, or from the person or immediate presence of a passenger of the motor vehicle, against his or her will and with the intent to

---

**14** The trial court found that the carjacking offenses against E.G. (count 10) and Ruth Weir (count 14) were completed before those victims were forced into their respective residences where the home invasion robberies occurred. We do not agree with the trial court's reasoning because, as we concluded in a case decided after defendant's trial, a completed carjacking requires asportation. (*People v. Lopez* (2003) 31 Cal.4th 1051, 1060–1963.) Nonetheless, we may still affirm the trial court's ruling, if it is supported by substantial evidence, on any valid ground.

either permanently or temporarily deprive the person in possession of the motor vehicle of his or her possession, accomplished by means of force or fear.' " (*People v. Ortega* (1998) 19 Cal.4th 686, 693; see § 215.) The completed offense of carjacking requires "asportation or movement of the motor vehicle." (*People v. Lopez, supra,* 31 Cal.4th 1051, 1055.) Carjacking is thus distinct from ordinary automobile theft because it is a crime accomplished by fear or force. Thus, this case is unlike *People v. Bauer* (1969) 1 Cal.3d 368, a decision of this court rendered before the enactment of the carjacking statute. In that case, the defendant entered the victims' residence and robbed them of various items, including their car keys. We held the defendant's subsequent conviction for automobile theft should be stayed pursuant to section 654, reasoning automobile theft is not a crime of violence but a violation of property interests to which the proscription against multiple punishments applies. (*Id.* at p. 378.) Here, carjacking is a crime of violence, distinct from robbery, and not merely a violation of the victims' property interest in their motor vehicle. It is also, of course, distinct from home invasion robbery because it involves the taking of a motor vehicle from the victims' persons or immediate presence.

Defendant attempts to cast his carjacking convictions as vehicle thefts that were part and parcel of a single course of conduct, beginning when the victims were removed from their cars and ending only when defendants left with the stolen items, which included the vehicles. Accordingly, defendant argues, the trial court erred when it declined to stay execution of the sentences on the carjacking counts. (See *People v. Ortega, supra,* 19 Cal.4th at p. 692.)

We disagree. Defendant was charged in each incident with, and the jury convicted him of, two distinct crimes of violence against the victims, robbery and carjacking. The temporal proximity of the two offenses is insufficient by itself to establish that they were incident to a single objective. Rather, viewing the evidence in the light most favorable to

the trial court's ruling, we affirm its conclusion that defendant harbored separate objectives for each offense and was appropriately punished for both.

Defendant and his cohorts confronted the victims at two points. They first accosted them at their cars and then again, inside the victims' residences when they demanded the victims' money and property. Had defendant simply intended to commit a carjacking, he could have done so at the initial point of contact. The evidence reveals, however, that defendant had another, distinct purpose—to rob (and commit other crimes) inside the victims' homes. The elevation of the threat to the victims by forcing them into their homes where defendant committed additional crimes amounts to a separate criminal objective. (See *People v. Green* (1996) 50 Cal.App.4th 1076, 1085 [defendant approached victim in her vehicle, robbed her of her purse, and then drove her to a secluded area where he attempted to rape her before driving off in her car; "the record contains sufficient evidence to support the trial court's explicit finding the taking of the purse and the taking of the vehicle were separate incidents which merited separate and additional punishment"].) Accordingly, we find no error in the court's refusal to stay the sentence on the carjacking counts.

### 3. *Error in Abstract of Judgment*

Defendant contends, and the Attorney General concedes, the abstract of judgment incorrectly reflects a sentence of life without the possibility of parole on count 15, the attempted murder of Michael Martinez. The sentence imposed by the trial court on this count was life with the possibility of parole. We will direct the superior court to correct the error.

### III. CONCLUSION

The superior court is directed to amend the abstract of judgment to reflect that defendant's sentence on count 15 is life with the possibility of parole and to forward the amended abstract of judgment to the Department of Corrections and Rehabilitation.  The judgment is otherwise affirmed.

**WERDEGAR, J.**


**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**BAXTER, J.**
**CHIN, J.**
**CORRIGAN, J.**

**CONCURRING AND DISSENTING OPINION BY LIU, J.**

Since the United States Supreme Court authorized reinstatement of the death penalty in 1976, the ultimate punishment has been governed by the principle that its imposition must be rationally guided by law, not left to the sentencer's unfettered discretion. Accordingly, the test for whether an individual is qualified to serve on a capital jury is whether he or she can faithfully apply the law in accordance with instructions given by the court. Neither strong support for the death penalty nor strong opposition to it is by itself disqualifying. The crucial inquiry is whether prospective jurors can set aside their personal views on the death penalty and follow the law.

This inquiry is not one that most people have thought much about. Most people never have reason to confront such a question apart from the rare circumstance of being evaluated for jury service in an actual death penalty case. When ordinary people are put in that situation, it may be the first time that they are being asked — under oath, by a person of authority, in a proceeding that really matters — to state their views on the death penalty and to consider whether their views should yield to their sense of civic duty or allegiance to the law.

Unsurprisingly, quite a few people do not find the question to be an easy one, and trial courts face the necessary but "difficult task of distinguishing between prospective jurors whose opposition to capital punishment will not allow them to apply the law or view the facts impartially and jurors who, though

opposed to capital punishment, will nevertheless conscientiously apply the law to the facts adduced at trial." (*Wainwright v. Witt* (1985) 469 U.S. 412, 421 (*Witt*).) An adequate evaluation of each prospective juror's ability to follow the law is thus essential to selecting a fair jury, and the erroneous disqualification of even a single prospective juror requires reversal of the death judgment. (See *Gray v. Mississippi* (1987) 481 U.S. 648, 659–668 (*Gray*); *People v. Riccardi* (2012) 54 Cal.4th 758, 783 (*Riccardi*).)

Today's opinion says a reliable answer to this all-important inquiry may be gleaned from one-word answers given by prospective jurors in response to a single question, bereft of any mention of the law or the proper role of jurors in a capital trial. I disagree. In this case, the trial court excused 16 prospective jurors on the basis of a single question that could have been — and, in fact, was — understood by some jurors to ask only about their personal views on the death penalty, not whether they could set aside their personal views and follow the law. Because the trial court lacked an adequate basis for disqualifying these jurors, the jury that sentenced defendant to death was not properly selected. Accordingly, I dissent from today's affirmance of the death judgment.

## I.

For nearly four decades, the constitutionality of the death penalty has rested on the principle that its imposition must reflect a determination of culpability by the sentencing authority that is "reasoned" and "rational," not "capricious or arbitrary." (*Gregg v. Georgia* (1976) 428 U.S. 153, 190–195 (joint opn. of Stewart, Powell, & Stevens, JJ.); see *Pulley v. Harris* (1984) 465 U.S. 37, 54 [upholding California's reinstatement of the death penalty in 1977]; *People v. Tuilaepa* (1992) 4 Cal.4th 569, 595.) Although the sentencer must have discretion to consider all relevant information concerning the defendant and the crime (see *Woodson v. North Carolina* (1976) 428 U.S. 280), it is imperative that this

2

discretion be "channeled" and "circumscribed by . . . legislative guidelines." (*Gregg*, at pp. 206–207.) Such guidelines are important "especially if sentencing is performed by a jury." (*Id.* at p. 192.) "Since the members of a jury will have had little, if any, previous experience in sentencing, they are unlikely to be skilled in dealing with the information they are given." (*Ibid.*) In order to prevent juries from "wantonly and freakishly impos[ing] the death sentence" (*id.* at p. 207), they must "be carefully and adequately guided in their deliberations" (*id.* at p. 193). In short, a capital jury must make its sentencing decision in accordance with law, not "untrammeled discretion." (*Gregg*, at p. 153; see *Furman v. Georgia* (1972) 408 U.S. 238.)

From this principle, it follows that eligibility to serve as a juror in a capital case does not turn dispositively on whether a person supports or opposes the death penalty. In capital cases, "as elsewhere, the quest is for jurors who will conscientiously apply the law and find the facts." (*Witt*, *supra*, 469 U.S. at p. 423.) The ultimate test, as set forth in *Witt*, is not what a prospective juror thinks of the death penalty but "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Id.* at p. 424.) Citizens called to jury service are asked to assume the role of an impartial decisionmaker, and the high court has long recognized that " '[a] man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State.' " (*Uttecht v. Brown* (2007) 551 U.S. 1, 6 (*Uttecht*), quoting *Witherspoon v. Illinois* (1968) 391 U.S. 510, 519 (*Witherspoon*).) "It is important to remember that not all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of

3

law." (*Lockhart v. McCree* (1986) 476 U.S. 162, 176 (*Lockhart*).) "[A] sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." (*Witherspoon*, at p. 522.) The crucial question is whether prospective jurors who oppose the death penalty are willing and able to set aside their personal beliefs and conscientiously apply the law. (*Witt*, at p. 421.)

In conducting this inquiry, trial courts must take a practical approach to assessing a prospective juror's fitness to serve. "[D]eterminations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." (*Witt*, *supra*, 469 U.S. at p. 424.) In evaluating a prospective juror's answers to voir dire questions, courts must focus on how the questions "might be understood—or misunderstood—by prospective jurors," not on "how the phrases employed in this area have been construed by courts and commentators." (*Witherspoon*, *supra*, 391 U.S. at p. 515, fn. 9.) Further, the *Witt* standard "does not require that a juror's bias be proved with 'unmistakable clarity.' " (*Witt*, at p. 424.) "[M]any veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear,' " even when "the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." (*Id.* at pp. 424–425.) On appellate review, we defer to the trial court's ruling when it is aided by an assessment of the prospective juror's demeanor. (See *People v. Whalen* (2013) 56 Cal.4th 1, 26 (*Whalen*).)

The high court applied these principles in *Darden v. Wainwright* (1986) 477 U.S. 168 (*Darden*). There the trial court asked a prospective juror named Murphy, " 'Do you have any moral or religious, conscientious moral or religious principles in opposition to the death penalty so strong that you would be unable

4

without violating your own principles to vote to recommend a death penalty regardless of the facts?' " (*Id.* at p. 178.)  Murphy, who had worked at a Catholic seminary, responded, " 'Yes, I have,' " and on that basis, he was excused.  (*Ibid.*)

In upholding the trial court's ruling, the high court said:  "The precise wording of the question asked of Murphy, and the answer he gave, do not themselves compel the conclusion that he could not under any circumstance recommend the death penalty." (*Darden*, *supra*, 477 U.S. at p. 178.)  Instead, *Darden* looked to "the context surrounding Murphy's exclusion to determine whether the trial court's decision that Murphy's beliefs would 'substantially impair the performance of his duties as a juror' was fairly supported by the record." (*Id.* at p. 176.)

The crucial context in *Darden* was that "[d]uring *voir dire*, but prior to individual questioning on this point, the trial court spoke to the entire venire . . . saying:  [¶] 'Now I am going to ask each of you individually the same question so listen to me carefully, I want to know if any of you have such strong religious, moral or conscientious principles in opposition to the death penalty that you would be unwilling to vote to return an advisory sentence recommending the death sentence even though the facts presented to you should be such *as under the law would require that recommendation*?  Do you understand my question?' " (*Darden*, *supra*, 477 U.S. at p. 176, italics added.)  Murphy was present in the courtroom when the trial court "repeatedly" asked this more detailed and correct formulation of the question to other prospective jurors.  (*Id.* at pp. 176–177; see *id.* at p. 177, fn. 3 [trial court further asked one juror:  " '[I]n the event that the evidence should be such that under the law that should be the legal recommendation you would be unwilling to return such a recommendation because of your conscientious beliefs?' "].)  Thus, by the time the trial court questioned Murphy, he had been "present throughout an entire series of questions

5

that made the purpose and meaning of the *Witt* inquiry absolutely clear." (*Id.* at p. 178.)  In addition, the high court explained, "[n]o specific objection was made to the excusal of Murphy by defense counsel.  Nor did the court perceive, as it had previously [with other prospective jurors], any need to question further.  Viewing the record of *voir dire* in its entirety, we agree . . . that the trial court's decision to exclude this juror was proper." (*Ibid.*)

Thus, *Darden* held that Murphy's answer to the single question posed to him was not adequate by itself to justify excusing him for cause.  But the record as a whole showed that Murphy would have understood that the trial court was asking whether he was willing to follow the law despite being personally opposed to the death penalty, and the trial court was entitled to interpret his answer accordingly.  (*Ibid.*; see *Uttecht*, *supra*, 551 U.S. at p. 13 ["The transcript of Juror Z's questioning reveals that, *despite the preceding instructions and information*, he had both serious misunderstandings about his responsibility as a juror and an attitude toward capital punishment that could have prevented him from returning a death sentence under the facts of this case." (italics added)].)

**II.**

The case before us presents the converse of *Darden*:  Here the trial court excused 16 prospective jurors on the basis of their answers to a single question, without any indication that those jurors understood the question to be asking whether they were "willing to temporarily set aside their own beliefs in deference to the rule of law." (*Lockhart*, *supra*, 476 U.S. at p. 176.)  In fact, the record contains affirmative proof that at least some prospective jurors did *not* understand the question to adequately probe whether their views on the death penalty were so unyielding as to substantially impair their performance as jurors in conformity with the law.

6

In assessing the qualifications of prospective jurors, the trial court used a two-step process. First, prospective jurors underwent an initial group screening before being asked to fill out written questionnaires. Then, after filling out the questionnaires and being instructed on the law and procedure governing capital sentencing trials, the jurors were subject to individualized voir dire led primarily by the attorneys. The venire was divided into four panels, and the trial court used the same procedure with each panel. The first and second panels were screened on Friday, October 10, 1997; the third and fourth panels were screened on Tuesday, October 14, 1997. In addition to summarizing the process here, I have reprinted the transcript of the screening process for each panel in an appendix to this opinion. Before going further, the reader may wish to read the transcript in order to see exactly what the trial court did. As explained below, the precise sequence of events — in particular, the difference between the trial court's approach to the October 10 panels and its approach to the October 14 panels — is critical to understanding what went wrong in this case.

After the first panel was sworn in, the trial court told the prospective jurors that this was a capital case and that "[i]f the jury in this case finds [defendant] guilty of murder in the first degree, and further finds that the special circumstances allegation is true, the jury in this case will be asked to determine the penalty in this case. [¶] The jury will have two options, and two options only, and that will be life without the possibility of parole, that will be life in prison, or death." The trial court later gave the same information to the second panel and added: "Now, people do tend to have strong opinions when it comes to the death penalty, and people are certainly entitled to have those opinions, and no such opinion is right or wrong, but we do need to find out what your feeling is in general on the death penalty before we can proceed any further, so I'm going to ask you first the

7

following couple of very general questions." The court gave similar introductory remarks to the third and fourth panels.

After this brief introduction, the court began its screening of each panel by asking the following question, which I will refer to as the initial screening question: "Because of your feelings about the death penalty in general, is there anyone who would be unable to vote to impose the punishment of death in this case or in any case, regardless of the evidence? [¶] If the answer is yes, if you'd rise." (This is what the trial court said to the second panel. The version that the court posed to the first and fourth panels did not include the words "in general," and the version posed to the first panel did not include the words "or in any case.")

Up to that point in the screening of each panel, the trial court had not given the prospective jurors any information about the legal framework that governs the death penalty in California. It had not explained that capital trials are bifurcated into a guilt phase and penalty phase, and that the jury at the penalty phase determines the appropriate sentence only after the parties have had the opportunity to present mitigating and aggravating evidence about the defendant and his crime. (Pen. Code, §§ 190.1, 190.3; all undesignated statutory references are to this code.) Nor had it explained that state law authorizes a death sentence only if the jury "concludes that the aggravating circumstances outweigh the mitigating circumstances." (§ 190.3.) In other words, before answering the initial screening question, the prospective jurors had not been informed that a capital jury decides on punishment in a proceeding separate from its determination of the defendant's guilt, that a jury chooses between death and a life sentence only after the parties have the opportunity to present new evidence not presented at the guilt phase, or that the law structures the jury's decision by setting forth relevant aggravating and mitigating factors, and by requiring the jury to find that aggravating circumstances outweigh mitigating circumstances before imposing a sentence of death. In

8

addition, the trial court never mentioned that the duty of jurors is to follow the law notwithstanding their personal views on the death penalty.

Ten prospective jurors on the first panel rose in response to the initial screening question. The court proceeded to ask essentially the same question or a portion of the question to each juror individually. For example, the court asked Prospective Juror T.L., "[Y]ou would be unable to vote to impose the punishment of death in this case, regardless of the evidence?" And the court asked Prospective Jurors C.M. and S.C., "[T]hat is regardless of what the evidence is; is that correct?" The court excused nine of the 10 prospective jurors after they answered "Yes," "Right," "Correct," or "That is correct" to such questions. The tenth prospective juror, K.O., was dismissed after saying, "Yes. I just don't believe in the death penalty." Defendant objected after the first two prospective jurors were dismissed, and the court overruled the objection. After these 10 prospective jurors were dismissed, the court distributed written questionnaires to the remaining panel members.

The court repeated this process with the second panel. This time, six prospective jurors rose in response to the court's initial screening question. Again, the court asked essentially the same question or a portion of it to each juror individually, and after answering, each was dismissed. After the first prospective juror was dismissed, the court asked defense counsel, "I assume you're making the same objection as before?" When counsel responded in the affirmative, the objection was overruled. Only one of the six prospective jurors, A.W., said more than "Yes" or "That is correct" in response to individual questioning. Before the court could question A.W., she said, "I just don't believe —." The court interrupted to ask her name. After hearing her name, the court asked, "And Miss [W.], you would be unable to impose the death penalty in this case or any case, regardless of the evidence; is that correct?" A.W. answered, "Yes," and she was

9

dismissed. The court then distributed questionnaires to the remaining panel members.

The court allowed voir dire of the remaining prospective jurors from the first two panels after they had filled out their questionnaires. Before doing so, the court explained to those jurors the bifurcated nature of capital proceedings. It also explained that at the penalty phase "the jury will then be given the opportunity to consider additional information, and the jury will be guided by the application of certain principles of law, which I will now read to you." The court then read the statutory aggravating and mitigating factors that a penalty phase jury must consider if relevant, and it explained that the weighing of these factors "does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them." It also explained that "to return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that they warrant death instead of life without parole."

The first two panels did not yield a sufficient number of prospective jurors, so the court summoned more prospective jurors four days later. The court repeated the screening process with two additional panels. As before, the court began by asking the same initial screening question. Six prospective jurors on the third panel stood up in response. At the start of each individual colloquy, however, each of these jurors summarized his or her death penalty views before the court asked any questions. Then, in the case of all the jurors except Prospective Juror G.L., the court posed questions that differed from the initial screening question. The court asked Prospective Juror J.L., "There is no possible case that you would vote to impose the death penalty on?" The court asked Prospective Jurors L.W., R.C., N.H., and E.S. the following (or substantially the same) question: "You could not even conceive of an instance where you would vote to

10

impose the death penalty?" The court also asked Prospective Juror N.H., "Have you given this subject any thought before right now?" All six prospective jurors provided more than one-word answers in describing their death penalty views, and several gave quite specific explanations. As a result of this more attentive screening process, the court did not dismiss the sixth prospective juror, E.S., who expressed some confusing views. E.S. was the first prospective juror not dismissed after standing in response to the court's initial screening question. E.S. went on to fill out a questionnaire, underwent voir dire by the parties, and ultimately survived a challenge for cause.

The court used a similar procedure to screen the fourth panel. Three prospective jurors rose in response to the initial screening question. After being questioned in a manner similar to the third panel, only one of the three, A.M., was dismissed. Prospective Juror E.B. initially told the court that he "could not participate in a jury that would be asked to impose death in any case." The court asked further, "So you could not conceive of a case where the death penalty might be appropriate?" E.B. replied, "I could conceive — I could conceive of a case, but I don't know that I'd want — I — I don't know that I would want to be part of that case." Based on this response, the court decided that E.B. needed to fill out a questionnaire. A similar colloquy ensued with Prospective Juror L.T., who initially said, "I would not like to be the one to decide on taking a person's life." The court asked, "So you would not want to participate?" L.T. replied, "No." The court then asked, "Could you conceive of a case that would be so horrendous that you would vote to impose the death penalty?" L.T. replied, "Yes." Finally, the court asked, "So depending on the circumstances or the evidence, you might be willing to vote to impose it?" L.T. replied, "Yes." At that point, the court decided that she too needed to fill out a questionnaire. Eventually, after full voir dire, E.B. was not challenged for cause, and the defense stipulated to L.T.'s dismissal.

11

As with the first two panels, the court provided a detailed explanation of capital sentencing law and procedure to the remaining prospective jurors from the third and fourth panels after they had filled out their questionnaires and before full voir dire began.

In describing the trial court's questioning of prospective jurors who stood up in response to the initial screening question, today's opinion says, "Some of these colloquies were more extensive than others, and on three occasions when there was ambiguity in the prospective juror's response the trial court did not excuse the individual." (Maj. opn., *ante*, at p. 24; see *id.* at pp. 26–27.) That is true, but it elides a crucial fact: The *only* colloquies that were more extensive occurred during the court's questioning of the third and fourth panels. Almost all of the colloquies with prospective jurors on the two October 14 panels were more detailed than any of the colloquies with prospective jurors on the two October 10 panels. And it is no accident that three of the nine prospective jurors who stood up on October 14 in response to the court's initial screening question were retained, whereas none of the 16 prospective jurors who stood up on October 10 was retained. These important differences between the October 10 panels and the October 14 panels, which go unmentioned in today's opinion, are summarized here:

| | Number of jurors who stood up in response to initial screening question | Number of jurors asked substantively different follow-up questions | Number of jurors retained |
|---|---|---|---|
| Panel 1 – Oct. 10 | 10 | 0 | 0 |
| Panel 2 – Oct. 10 | 6 | 0 | 0 |
| Panel 3 – Oct. 14 | 6 | 5 | 1 |
| Panel 4 – Oct. 14 | 3 | 3 | 2 |

## III.

In assessing the trial court's screening process, I begin by discussing the proper standard of review. I then show that the October 10 screening process did not adequately probe the crucial question under *Witt*: whether a prospective juror's death penalty views would substantially impair his or her performance as a juror in accordance with the law. The inadequacy of the screening process, I explain, is confirmed by precedents of this court and others.

## A.

Although a trial court's excusal of a prospective juror for cause is typically afforded deference on appeal, there is no basis for deference to the trial court's excusal of the 16 prospective jurors from the two October 10 panels. Deference is warranted where a finding of substantial impairment "is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province." (*Witt*, *supra*, 469 U.S. at p. 428; see *Whalen*, *supra*, 56 Cal.4th at p. 26 [deference is appropriate because the trial judge is in a position to hear " ' "the person's tone of voice, apparent level of confidence, and demeanor" ' "].) "But such deference is unwarranted when . . . the trial court's ruling is based solely on the 'cold record' of prospective jurors' answers on a written questionnaire, the same information that is available on appeal." (*People v. Avila* (2006) 38 Cal.4th 491, 529 (*Avila*); see *People v. McKinnon* (2011) 52 Cal.4th 610, 647 (*McKinnon*); *People v. Stewart* (2004) 33 Cal.4th 425, 451 (*Stewart*).) By the same token, deference is unwarranted where, as here, the trial court's rulings were based on nothing more than seeing prospective jurors stand up as a scattered group in a courtroom full of other prospective jurors in response to an initial screening question, and then hearing those jurors utter one-word responses to substantively identical leading questions.

Recall that the trial court, in questioning each prospective juror who stood up on October 10, simply repeated the initial screening question or a portion of it: "That is regardless of the evidence; is that correct?" "Your answer is that you would be unable to impose the penalty of death, regardless of the evidence?" "And that would be in any case; is that correct?" Fourteen of the 16 jurors were excused after saying nothing more than "Yes," "Right," or "Correct" in response to such questions. Prospective Juror K.O. said, "I just don't believe in the death penalty," and the court did not inquire further. When Prospective Juror A.W. tried to explain her views by saying, "I just don't believe—," the trial court interrupted her and continued with the same questioning. In light of the rote and rapid process by which the trial court excused the 16 prospective jurors from the two October 10 panels, it strains credulity to suggest that the trial court based its rulings on an evaluation of "their credibility and their conviction." (Maj. opn., *ante*, at p. 27.)

Noting that "the court asked more questions of some jurors and fewer of others," the Attorney General contends that "the presumptive explanation for the difference in questioning lies in the demeanor of the jurors and the tone of their responses." Today's opinion makes a similar argument. (Maj. opn., *ante*, at pp. 26–28.) But the trial court did not simply ask more questions of some jurors and fewer of others. More precisely, the record shows a clear pattern: The court asked more questions in screening the prospective jurors who stood up on October 14 than it asked those who stood up on October 10. And whereas the court asked *none* of the 16 prospective jurors who stood up on October 10 any questions materially different from the initial screening question, it asked eight of the nine prospective jurors who stood up on October 14 at least one question, and sometimes several questions, different from the initial screening question. Demeanor cannot explain this pattern of disparate questioning unless one posits, implausibly, that all the prospective jurors who stood up on October 10 did so in a

14

more resolute manner or uttered "Yes," "Right," or "Correct" more forcefully than almost all the prospective jurors who stood up on October 14. Isn't the more natural inference that the trial court, having had four days between October 10 and October 14 to reflect on its approach to voir dire, decided it was advisable to conduct more detailed voir dire of the latter two panels? Further, although it is true that the trial court did not excuse three prospective jurors who gave confusing or ambiguous answers (*id.* at p. 27), the key fact is that all three jurors gave such answers in response to the court's different approach to individual questioning on October 14. By contrast, when the court essentially parroted the initial screening question to individual jurors on October 10, almost every one of the 16 jurors questioned was excused on the basis of one-word answers. (Because seeing is believing, I again refer the reader to the full transcript in the appendix.)

On this record, deference may well be appropriate in reviewing the trial court's dismissal of six prospective jurors from the October 14 panels. But no deference is owed to its excusal of the 16 prospective jurors from the October 10 panels. There is not the slightest hint that the trial court considered the demeanor of those jurors, which explains why today's opinion must resort to the truism, applicable to *every* case on appeal, that "the trial court was present at the voir dire and we were not." (Maj. opn., *ante*, at p. 30.) The trial court was present, but instead of using a screening process from which it could " 'glean[] valuable information that simply does not appear on the record,' " it relied on "the same information that is available on appeal" in excusing those 16 prospective jurors. (*Avila*, *supra*, 38 Cal.4th at p. 529.) Accordingly, the question on appeal is whether the record reflects " '*sufficient* information . . . to permit a *reliable* determination' that the juror's death penalty views 'would " 'prevent or substantially impair' " the performance of his or her duties (as defined by the court's instructions and the juror's oath) . . . .' " (*McKinnon*, *supra*, 52 Cal.4th at

15

p. 648.)  Under this "quite exacting" standard (*ibid.*), the trial court's minimal screening of the 16 prospective jurors excused on October 10 does not suffice.

**B.**

For several reasons, it is unlikely that prospective jurors understood the trial court's initial screening question to be asking whether they would be willing to set aside their personal opposition to the death penalty and follow the law.

The initial screening question posed to the first October 10 panel asked whether any prospective jurors had "feelings about the death penalty" that would make them unable to vote to impose death.  Similarly, the initial screening question posed to the second October 10 panel asked whether anyone would be unable to vote to impose death "[b]ecause of your feelings about the death penalty in general."  On a commonsense understanding, these questions invited prospective jurors to examine their "feelings" about capital punishment, not to consider any countervailing allegiance they might have to the rule of law or the duty of citizens to impartially apply the law when serving as a juror.

This problem is especially apparent with respect to the second October 10 panel, where the trial court prefaced its initial screening question by saying, "Now, people do tend to have strong opinions when it comes to the death penalty, and people are certainly entitled to have those opinions, and no such opinion is right or wrong, but we do need to find out *what your feeling is in general on the death penalty* before we can proceed any further, so I'm going to ask you first the following couple of *very general questions*."  (Italics added.)  This comment, as well as the actual wording of the initial screening question posed to the second October 10 panel, informed prospective jurors that the court sought to probe their "general" feelings about the death penalty, not the specific issue of whether they could set aside their feelings in deference to the rule of law.

16

Moreover, it is particularly significant that the trial court, before questioning the prospective jurors, never informed them that the law provides a framework for deciding on the penalty in a capital case. Without such instruction, the prospective jurors had no reason or informed basis to consider whether they were so wedded to their personal views on the death penalty that they could not faithfully apply the law. Although it is true that many people have strong views on the death penalty in general, it is also true that most people think of themselves as dutiful and law abiding. One may well conclude, as in *Darden* and other cases (see *post*, at pp. 24–27), that a prospective juror has decided her personal views would impair her ability to follow the law if she says she cannot vote for the death penalty after having been told what the law requires. But it is not realistic to think that the initial screening question here would have prompted prospective jurors, *without any instruction on the law*, to focus on how they would resolve any conflict between personal opposition to the death penalty and adherence to the law — a question most prospective jurors are unlikely to have considered before.

This last point illuminates the limited significance of the trial court's inquiry into whether prospective jurors would be "unable" to vote for death "regardless of the evidence." As noted, the high court in *Darden* upheld the dismissal of a juror based on his affirmative answer to a single question only after concluding that the juror "was present throughout an entire series of questions" — including questions that referred to what the law required — "that made the purpose and meaning of the *Witt* inquiry absolutely clear." (*Darden*, *supra*, 477 U.S. at p. 178.) The context here could not be more different: The trial court did not say anything about what the law required before asking the initial screening question. In addition, defense counsel here, unlike in *Darden* (see *ibid.*), did object to the excusal of prospective jurors during the October 10 screening process, and the trial court here, unlike in *Darden* (see *ibid.*), did not distinguish

17

among the 16 jurors dismissed on October 10 by asking some of them, but not others, further questions distinct from the initial screening question.

Even if some prospective jurors had understood the initial screening question to ask whether they could set aside their personal beliefs and follow the law, we still could not presume that the phrase "regardless of the evidence" adequately conveyed what the law requires. Without instruction as to the existence or nature of a separate penalty phase in a capital trial, many prospective jurors would have no basis to properly understand what "evidence" the court was referring to. A layperson, unschooled in death penalty law, may well assume that after finding a capital defendant guilty, the jury must decide on the penalty without hearing additional evidence. Such a person could reasonably understand the phrase "regardless of the evidence" to mean regardless of the evidence *of guilt*. (See *Witherspoon*, *supra*, 391 U.S. at p. 515, fn. 9 ["What matters is how [the phrase] might be understood—or misunderstood—by prospective jurors."].) But a person who is unable to impose the death penalty no matter how strong the evidence of guilt is not necessarily a person who would be unable to impose the death penalty after a separate trial in which the parties have had a fair opportunity to present aggravating and mitigating evidence. A person may reasonably believe it is unfair to impose the death penalty based on evidence that the defendant committed a horrible crime, however damning the evidence may be, yet also believe it can be fair to impose the death penalty after having had a chance to consider relevant facts about the defendant's life, upbringing, and possible impairments. Because the trial court never explained the nature of a penalty trial before asking the initial screening question, it is entirely plausible, even likely, that one or more prospective jurors answered the question without an accurate understanding of what evidence may properly inform the penalty decision. (See *Carter v. Kentucky* (1981) 450 U.S. 288, 302 ["Jurors are not experts in legal

18

principles; to function effectively, and justly, they must be accurately instructed in the law."].)

Of course, we do not know what the 16 prospective jurors excused from the October 10 panels were actually thinking when they answered the initial screening question. That is because the trial court did not ask, and it appeared disinterested in anything more than one-word answers to its rote questioning. But were there any doubt that the initial screening question did not adequately probe whether prospective jurors could follow the law, we have in this case a built-in comparison group: the prospective jurors who stood up in response to the initial screening question on October 14 *and then* — unlike the 16 jurors dismissed on October 10 — answered additional, different questions posed by the court to each juror individually. As it turns out, the initial screening question was insufficient to disqualify one-third of those nine jurors: the court did not excuse E.S., E.B., or L.T. Had the court questioned them in the same rote way it had questioned the 16 prospective jurors on October 10, in all likelihood they would have been dismissed. But the court took a different approach to questioning the prospective jurors who stood up on October 14, and the court's exchanges with E.S., E.B., and L.T. demonstrate the inadequacy of the October 10 process.

As noted, E.B. initially said, "I could not participate in a jury that would be asked to impose death in any case." But in response to further questioning by the court, E.B. said he "could conceive of a case [where the death penalty might be appropriate], but I don't know that I'd want — I — I don't know that I would want to be part of that case." On that basis, E.B. survived screening. He filled out a questionnaire and heard the court's instructions on the law that governs capital sentencing proceedings. Then, during full voir dire, the court reminded E.B. that he had originally expressed opposition to the death penalty. E.B. explained, "when I came into, you know, the audience, as you put it, I wasn't expecting, you

19

know, such issues at that time.  [¶] *But having time to look at the questionnaire and read the questions, and understanding and following the judge's instructions*, I still have an uneasy feeling, but I feel I could perform the job as a juror, basing my decision on the evidence only and on the law as instructed by the judge." (Italics added.)  In light of this exchange, E.B. was not challenged for cause.

Similarly, L.T. initially said she "would not like to be the one to decide on taking a person's life" and "would not want to participate."  But when the court pressed her a little more, L.T. said that she could "conceive of a case that would be so horrendous that [she] would vote to impose the death penalty" and that "depending on the circumstances or the evidence, [she] might be willing to vote to impose it."  On that basis, the court decided she should not be excused at the screening phase.

E.S. initially said she "couldn't conceive of any instance where [she] would vote to impose the death penalty," citing her religion.  But the court went on to ask a series of questions that prompted E.S. to give some confusing answers.  On that basis, the court decided that E.S. should fill out a questionnaire and receive instruction on the law.  During full voir dire, the prosecutor said to E.S., "You said that you just don't believe in the death penalty in your questionnaire.  [¶] Is that your honest opinion as you sit here today?"  E.S. replied, "Yes."  The prosecutor then asked E.S. about her answers to the court's screening questions.  She responded, "I forgot what I said.  I was so nervous."  After further questioning, the prosecutor ultimately asked, "[D]o you really, honestly believe that you could make that decision and vote for death, if we got to that point in this trial, and *under the facts and the law it was appropriate*?"  (Italics added.)  E.S. replied, "I'll say yes, yes."  When the prosecutor subsequently challenged E.S. for cause, the court overruled the challenge, saying to the prosecutor, "Well, I think you did a pretty good job of rehabilitating her . . . ."

20

These exchanges show that with only a bit of additional probing, prospective jurors who claim they are "unable" to vote for the death penalty "regardless of the evidence" may reveal that they do not actually hold such an absolute position. In addition, the voir dire answers given by E.B. and E.S. after they filled out the questionnaire and received instruction on the law show that prospective jurors who answered the initial screening question in the affirmative may have been able nonetheless to set aside their personal opposition to the death penalty and apply the law.

What happened with E.B. and E.S. is consistent with what occurs in many capital cases: Prospective jurors who give apparently disqualifying answers during voir dire or on a written questionnaire are often rehabilitated after being instructed that the law requires jurors to set aside their personal beliefs. Courts have certainly found this to be true of jurors who firmly believe that all murderers should get the death penalty or that the biblical principle of "an eye for an eye" should dictate punishment. (See, e.g., *Whalen*, *supra*, 56 Cal.4th at pp. 31–36; *People v. Martinez* (2009) 47 Cal.4th 399, 442, 445; *People v. Crittenden* (1994) 9 Cal.4th 83, 122–123; *State v. Roberts* (Ohio 2006) 850 N.E.2d 1168, 1180–1181; *State v. Juniors* (La. 2005) 915 So.2d 291, 310–313; *Barnhill v. State* (Fla. 2002) 834 So.2d 836, 844–845; *Young v. Commonwealth* (Ky. 2001) 50 S.W.3d 148, 164; *People v. Buss* (Ill. 1999) 718 N.E.2d 1, 27–28; *State v. Barone* (Or. 1998) 969 P.2d 1013, 1020–1022; *Manley v. State* (Del. 1998) 709 A.2d 643, 655–656; *Walker v. State* (Miss. 1995) 671 So.2d 581, 624–626; *State v. Quesinberry* (N.C. 1987) 354 S.E.2d 446, 450–451; *Miles v. State* (Ala.Crim.App. 1997) 715 So.2d 913, 919; *Eizember v. State* (Okla.Crim.App. 2007) 164 P.3d 208, 223–226; *Cordova v. State* (Tex.Crim.App. 1987) 733 S.W.2d 175, 183–184.) There is no reason to think that jurors who oppose the death penalty are any less capable of

setting aside their personal views after being instructed on the law. (See *Uttecht*, *supra*, 551 U.S. at p. 6; *Lockhart*, *supra*, 476 U.S. at p. 176.)

Indeed, not everyone who opposes the death penalty opposes it on the uncompromising ground that it is always wrong for the state to take a human life. Many people oppose it on more limited grounds; they may believe that the death penalty is applied unfairly, that it is ineffective as a deterrent to crime, or that it costs too much money to administer. Such beliefs may induce opposition to the death penalty in general, regardless of the evidence in a particular case. But when instructed on the law and pressed to weigh one's personal views against one's civic duty, opponents of the death penalty no less than its proponents may be willing to temporarily set aside their personal views. They may do so because a proper understanding of the law allays their concerns or because instruction by a judge in a solemn proceeding impresses upon them that fair adjudication of a particular case requires impartiality and fidelity to the law. Here the trial court prematurely excused 16 prospective jurors without an adequate examination of their views.

## C.

In reaching a contrary conclusion, today's opinion relies on *Riccardi*, *supra*, 54 Cal.4th 758, and *Avila*, *supra*, 38 Cal.4th 491, and distinguishes *Stewart*, *supra*, 33 Cal.4th 425, and *People v. Heard* (2003) 31 Cal.4th 946 (*Heard*). (Maj. opn., *ante*, at pp. 26–29.) Because our case law in this area is necessarily fact intensive, it is difficult to say that any one case squarely dictates the answer here. Nevertheless, one thing is clear: We have never upheld the excusal of a prospective juror for cause solely based on a one-word answer to a single, isolated question that asked whether the juror would be "unable" to impose the death penalty "regardless of the evidence." Where we have found the answer to such a question disqualifying, it has been in contexts where prospective jurors insisted on

22

adhering to their personal views in the face of additional information clearly stating that jurors have a duty to set aside their personal views and follow the law.

In *Heard*, the prosecution challenged a prospective juror because he wrote in his questionnaire that he considered life without parole a more severe penalty than death. (*Heard*, *supra*, 31 Cal.4th at pp. 963–964.) Upon being informed during voir dire that the law required jurors to treat the death penalty as the more severe sentence, the juror said he would do " 'whatever the law states.' " (*Id.* at p. 964.) Still, the trial court excused the juror for cause. We said: "In view of [the prospective juror's] clarification of his views during voir dire, we conclude that his earlier juror questionnaire response, *given without the benefit of the trial court's explanation of the governing legal principles*, does not provide an adequate basis to support [his] excusal for cause." (*Ibid.*, italics in original.)

In *Stewart*, the trial court excused five prospective jurors for cause based solely on their written answers to a questionnaire item that asked, " 'Do you have a conscientious opinion or belief about the death penalty which would prevent or make it very difficult for you . . . [t]o ever vote to impose the death penalty?' " (*Stewart*, *supra*, 33 Cal.4th at pp. 442–445.) That question was the *only* item on the questionnaire that asked prospective jurors their views on the death penalty. (*Id.* at p. 442.) Each of the five dismissed jurors answered "yes" and added one of the following comments: " 'I do not believe a person should take a person's life. I do believe in life without parole.' " " 'I am opposed to the death penalty.' " " 'I do not believe in capit[a]l punishment.' " " 'In the past, I supported legislation banning the death penalty.' " " 'I don't believe in irrevers[i]ble penalties. A prisoner can be released if new information is found.' " (*Id.* at pp. 444–445.)

We first explained that the single item on the questionnaire was inadequate because it asked prospective jurors only whether they would find it "very difficult" to vote for a death sentence. "[A] prospective juror who simply would find it

23

'very difficult' ever to impose the death penalty, is entitled — indeed, duty bound — to sit on a capital jury, unless his or her personal views actually would prevent or substantially impair the performance of his or her duties as a juror." (*Stewart*, *supra*, 33 Cal.4th at p. 446.)

We then addressed the prospective jurors' written comments. In discussing the prospective juror who wrote that he did not believe in taking a person's life, we said: "Absent clarifying follow-up examination by the court or counsel . . . — *during which the court would be able to further explain the role of jurors in the judicial system*, examine the prospective juror's demeanor, and make an assessment of that person's ability to weigh a death penalty decision — the bare written response was not by itself, or considered in conjunction with the checked answer, sufficient to establish a basis for exclusion for cause." (*Stewart*, *supra*, 33 Cal.4th at p. 448, italics added.) We applied similar reasoning in finding the written comments of the other four jurors insufficient to justify disqualification. (*Id.* at pp. 448–449.) Further, we said that "although the poor phrasing of the juror questionnaire used in this case contributes to our conclusion that the prospective jurors were excused in violation of *Witt*, *supra*, 469 U.S. 412, 424, we note that even if the questionnaire had tracked the 'prevent or substantially impair' language of *Witt*, we still would find that the prospective jurors could not properly be excused for cause without any follow-up oral voir dire by the court." (*Id.* at pp. 451–452.) Thus, a prospective juror's answer to a single item on a questionnaire — even a question that tracks the *Witt* standard — is not enough to justify an excusal for cause in the absence of any instruction on the law or any additional context suggesting that the answer reliably indicates the juror's inability to follow the law. And while it is true that "[i]n this case, unlike in *Stewart*, the jurors were personally questioned by the trial court" (maj. opn., *ante*, at p. 28), that distinction makes no difference because, as discussed (*ante*, at pp. 13–14), it is

24

quite improbable that the trial court's rote screening process on October 10 took each juror's demeanor into account.

Our decision in *People v. Wilson* (2008) 44 Cal.4th 758 (*Wilson*) carefully applied the principles above. The prospective jurors in *Wilson* filled out a questionnaire that included "a long prefatory statement setting forth the basic procedure applicable to capital cases." (*Id.* at p. 781.) One questionnaire item was a multiple choice question asking whether " 'you have . . . a willingness to fairly consider whatever evidence is presented' " during the penalty phase. (*Id.* at p. 783.) The trial court excluded any prospective juror who selected option (b), which said, " ' No matter what the evidence was, <u>ALWAYS</u> vote for life without possibility of parole,' " instead of option (c), which said, " 'I would consider all the evidence and the jury instructions as provided by the court and impose the penalty I personally feel is appropriate.' " (*Ibid.*)

We held that the trial court's exclusion of two prospective jurors for having selected option (b) was proper in context. (*Wilson*, *supra*, 44 Cal.4th at pp. 785−789.) Excluding those jurors was "consistent with the import of the questionnaire as a whole. The prefatory statement at the beginning of the section of the questionnaire concerning the death penalty [citation] gave prospective jurors the basic outline of the penalty phase procedures involved, including the need for a fair assessment and weighing of aggravating and mitigating circumstances. This written outline reinforced the trial court's oral statement, delivered before the jurors were given the questionnaires, which provided similar background information." (*Id.* at p. 788.) Further, "by checking [option (b)]," the prospective jurors "necessarily chose *not* to check [option (c)]." (*Ibid.*) "In short, a fair reading of the questionnaire demonstrates that [the prospective jurors] *must have known the scope and nature of the discretion they would wield in the penalty phase*, but nonetheless checked [option (b)], indicating that they would *always*

25

vote for life over death *irrespective* of the facts and circumstances." (*Ibid.*, first italics added.)

In *Avila*, we held that the trial court properly dismissed four prospective jurors for cause based solely on their juror questionnaires. (*Avila*, *supra*, 38 Cal.4th at pp. 527–533.) The 24-page questionnaire in *Avila* consisted of 108 questions; "[s]everal pages . . . focused on the prospective jurors' views concerning the death penalty." (*Id.* at p. 528.) As today's opinion notes (maj. opn., *ante*, at p. 26), items 97, 98, and 99 on the questionnaire "asked whether a prospective juror held such conscientious objections to the death penalty that, regardless of the evidence or the strength of proof, he or she 'automatically' would refuse to return a first degree murder verdict, find a special circumstance true, or impose the death penalty." (*Avila*, at p. 531; see *id.* at p. 528, fn. 23.) What today's opinion does not mention is that items 97, 98, and 99 came after item 91, which said: " 'One of the duties of a juror is to follow the law as it is instructed to you. Do you honestly think that you could set aside your personal feelings and follow the law as the Court explains it to you, even if you had strong feelings to the contrary?' " (*Ibid.*) Crucially, our analysis of all four dismissed jurors relied on the fact that each had been informed, through item 91, that jurors have a duty to set aside their personal feelings and follow the law. (*Id.* at pp. 531–533 & fn. 26.) It was in that context that we found the jurors' adherence to their personal views in answering items 97, 98, and 99 to be sufficient grounds for excusal.

*Riccardi* is similar. Today's opinion focuses on question No. 68 of the juror questionnaire in *Riccardi*, which asked: " 'Do you have such an opinion concerning the death penalty that, regardless of the evidence that might be developed during the penalty phase of the trial . . . you would automatically and absolutely refuse to vote for the death penalty in any case?' " (*Riccardi*, *supra*, 54 Cal.4th at p. 780; see maj. opn., *ante*, at p. 26.) But today's opinion does not

mention that *Riccardi* identified not only question No. 68 but also question No. 65 as "[t]he two questions most directly relevant to the *Witt* standard." (*Riccardi*, at p. 780.) Question No. 65 "specifically called for a 'yes' or 'no' answer" to the following: " 'Could you set aside your own personal feelings regarding what the law ought to be and follow the law as the court explains it to you?' " (*Ibid.*) *Riccardi* held that "these *two questions*, by themselves, were 'sufficiently clear' such that a 'yes' or 'no' answer to each of them would ' "leave no doubt" ' as to whether a prospective juror was 'willing or able to set aside his or her personal views and follow the law.' " (*Ibid.*, italics added.) As in *Avila*, our analysis in *Riccardi* upholding the dismissal of three prospective jurors relied on the fact that their responses insisted on adherence to their personal views even though question No. 65 had made clear that jurors must set aside their personal views and follow the law. (*Riccardi*, at pp. 781–782.)

Here, no *additional* question akin to item 91 in *Avila* or question No. 65 in *Riccardi* informed prospective jurors that the trial court's initial screening question was intended to probe whether they could set aside their personal views and follow the law. Our case law applying *Witt* requires trial courts to do more than elicit one-word answers to a single, isolated question that neither follows nor contains any mention of jurors' duty to follow the law.

Other courts applying *Witt* have taken a similar view. In *State v. Sexton* (Tenn. 2012) 368 S.W.3d 371, a multiple choice item on a written questionnaire asked prospective jurors to select the answer that " 'best reflects your feeling about the death penalty,' " and it listed " 'Never vote for the death penalty' " among the options. (*Id.* at p. 389.) The trial court excused all prospective jurors who chose that option without voir dire and without considering their answers to other questionnaire items. The Tennessee Supreme Court found this procedure inadequate to determine "whether the juror is predisposed to a certain result

27

regardless of the law." (*Id.* at p. 393.) The single question, without further context, was not "tethered to the circumstances of the case" and lacked "predictive value as to whether the prospective juror's responses represent more than a general objection to . . . the implementation of the death penalty." (*Ibid.*) In addition, several prospective jurors' "inconsistent answers [on other questionnaire items] suggest[ed] a level of uncertainty and highlight[ed] the risk that eliminating prospective jurors based solely on an answer to one written question may result in the exclusion of" qualified jurors. (*Id.* at p. 395.)

In *Fuselier v. State* (Miss. 1985) 468 So.2d 45, the prosecutor asked the entire venire as a group, " 'Are there are any of you that just could not vote the death penalty no matter what the facts or what the circumstances are? No matter what?' " (*Id.* at p. 54.) A prospective juror who stood up in response to the question was dismissed for cause without voir dire. (*Ibid.*) The Mississippi Supreme Court held that "the failure to fully develop any voir dire regarding [the prospective juror] rendered her dismissal for cause error. A clear showing that a juror's views would prevent or significantly impair the performance of his or her duties requires more than a single response to an initial inquiry." (*Id.* at p. 55.)

Finally, in *United States v. Chanthadara* (10th Cir. 2000) 230 F.3d 1237, a prospective juror wrote on a questionnaire, " 'I believe the death penalty is proper in some cases although I don't think I would be able to vote for the death penalty in a case,' " and she elsewhere "clarified that this was because she didn't feel she would 'ever be 100% sure that [death] was the proper verdict.' " (*Id.* at p. 1271.) The Tenth Circuit held that she was wrongly excused on the basis of these answers because "she was never asked, or required to answer, whether, if the facts of the case and the evidence presented warranted imposition of the death penalty under the law, she would at least consider imposing a death sentence in light of her personal convictions. Thus, none of the questions which [the prospective juror]

28

answered articulated the proper legal standard under *Witt*." (*Id.* at pp. 1171–1172.)

## IV.

To sum up: This is not a case where the question posed to prospective jurors tracked the language of *Witt* or directly asked whether they could set aside their personal views and follow the law. This is not a case where prospective jurors had been instructed on the law or on the duty of jurors to follow the law before answering what the trial court deemed a dispositive question about their death penalty views. This is not a case where the trial court, in excusing prospective jurors based on one-word answers to a single initial screening question, considered each juror's demeanor and carefully distinguished between those who did and those who did not need to be questioned further. And this is not a case where we need to speculate on the infirmity of the initial screening question posed by the trial court. For we know that the question was inadequate to disqualify three of the nine prospective jurors whom the trial court screened on October 14 using questions different from the one it posed to all 16 jurors who stood up on October 10. And we know that two of the three jurors who survived the initial screening turned out to be qualified to serve on this capital jury.

As this court has unanimously observed: "When first called to the capital venire, prospective jurors frequently know little about death penalty law and procedure and have reflected little on their own attitudes; their responses often change between the questionnaire and voir dire as well as during examination." (*People v. Brasure* (2008) 42 Cal.4th 1037, 1053.) In the same opinion, we called it "a desirable form of education for a prospective juror" to learn "what their duty would be should they serve as penalty phase jurors." (*Ibid.*) In this case, it is unclear why the trial court, at the outset of its screening process, did not give prospective jurors the brief overview of California's death penalty law that it gave

29

before full voir dire.  What is clear is that the trial court's October 10 screening process provided no such "education" (*ibid.*), nor did it elicit from each prospective juror a considered judgment as to whether he or she could follow the law.  Because the trial court erroneously excused 16 prospective jurors for cause, I respectfully dissent from the court's affirmance of the death judgment.

I join the portions of today's opinion affirming defendant's convictions and rejecting his noncapital sentencing claims.

LIU, J.

I CONCUR:  PEÑA, J.*

---

\*      Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

## APPENDIX TO CONCURRING AND DISSENTING OPINION

*First panel — October 10, 1997*

"THE COURT: As I started to say, one of the charges against Mr. Capistrano in this case is murder, and it's alleged that it's murder in the first degree.

"It's further alleged that due to the manner in which the murder was committed, that special circumstances exist.

"If the jury in this case finds Mr. Capistrano guilty of murder in the first degree, and further finds that the special circumstances allegation is true, the jury in this case will be asked to determine the penalty in this case.

"The jury will have two options, and two options only, and that will be life without the possibility of parole, that will be life in prison, or death.

"The reason I'm mentioning that is this: Now, without knowing anything at all about this case, is there any juror sitting in the audience right now that, regardless of what the evidence might be, has such feelings about the death penalty that he or she would be unable to vote to impose the death penalty in this case?

"If the answer is yes, if you'd rise, please.

"I need to know your name.

"PROSPECTIVE JUROR [C.M.]: [C.M.]

"THE COURT: Miss [M.], that is regardless of what the evidence is; is that correct?

"PROSPECTIVE JUROR [C.M.]: Yes.

"THE COURT: All right. You are excused. Thank you.

"Your name, sir?

"PROSPECTIVE JUROR [S.C.]: [S.C.]

31

"THE COURT:  And Mr. [C.], that is regardless of the evidence; is that correct?

"PROSPECTIVE JUROR [S.C.]:  Yes.

"THE COURT:  You are excused.

"[DEFENSE COUNSEL]:  Your Honor, for purpose of the record, we ask that the jurors not be excused, object to their being excused, and ask in the alternative that they be allowed to participate in a pool of jurors that determine the guilt phase, at least, of the trial.

"THE COURT:  Your objection is noted and overruled.

"Your name, ma'am?

"PROSPECTIVE JUROR [D.G.]:  [D.G.]

"THE COURT:  Miss [G.], your answer is that you would be unable to vote to impose the penalty of death, regardless of the evidence?

"PROSPECTIVE JUROR [D.G.]:  Yes.

"THE COURT:  You are excused.  Thank you.

"And you, Miss [O.]?

"PROSPECTIVE JUROR [K.O.]:  Yes.

"THE COURT:  And your answer would be the same?

"PROSPECTIVE JUROR [K.O.]:  Yes, sir.

"THE COURT:  Regardless of the evidence, you would be unable to vote to impose the punishment of death?

"PROSPECTIVE JUROR [K.O.]:  Yes.  I just don't believe in the death penalty.

"THE COURT:  Thank you.  You are excused.

"PROSPECTIVE JUROR [K.O.]:  Thank you.

"PROSPECTIVE JUROR [A.U.]:  [A.U.]

32

"THE COURT: Miss [U.], regardless of the evidence in this case, you would be unable to vote to impose the punishment of death; is that correct?

"PROSPECTIVE JUROR [A.U.]: Correct.

"THE COURT: And that would be in any case; is that correct?

"PROSPECTIVE JUROR [A.U.]: Right.

"THE COURT: You are excused, as well.

"PROSPECTIVE JUROR [A.U.]: Thank you, sir.

"THE COURT: And you, as I recall, are Miss [A.].

"PROSPECTIVE JUROR [C.A.]: Yes.

"THE COURT: And you would be unable to vote to impose the punishment of death in any case; is that correct?

"PROSPECTIVE JUROR [C.A.]: Yes.

"THE COURT: Regardless of the evidence?

"PROSPECTIVE JUROR [C.A.]: Yes.

"THE COURT: You are excused, as well.

"Your name, ma'am?

"PROSPECTIVE JUROR [J.W.]: [J.W.]

"THE COURT: Miss [W.], you would be unable to vote to impose the death penalty in this case or any case, regardless of the evidence; is that correct?

"PROSPECTIVE JUROR [J.W.]: Yes.

"THE COURT: You are excused, as well. Thank you.

"In the back row, your name, please?

"Excuse me, the second row.

"PROSPECTIVE JUROR [T.L.]: [T.L.]

"THE COURT: Miss [L.], you would be unable to vote to impose the punishment of death in this case, regardless of the evidence?

"PROSPECTIVE JUROR [T.L.]: That is correct, sir.

33

"THE COURT:  You are excused.

"THE CLERK:  That was [T.L.]?

"THE COURT:  [Repeats Prospective Juror T.L's name.]

"PROSPECTIVE JUROR [T.L.]:  [Spells name.]

"THE COURT:  Thank you.

"And the lady next to her?

"PROSPECTIVE JUROR [Z.M.]:  [Z.M.]

"THE COURT:  Yes.  And you would be unable to impose the punishment of death in this case or any case, regardless of the evidence?

"PROSPECTIVE JUROR [Z.M.]:  Yes.

"THE COURT:  Thank you.

"And finally, your name, ma'am?

"PROSPECTIVE JUROR [A.S.]:  [A.S.]

"THE COURT:  And Miss [S.], you would be unable to vote to impose the — actually, I should say you would be unwilling to impose the death penalty in this case or any case, regardless of the evidence?

"PROSPECTIVE JUROR [A.S.]:  Yes.

"THE COURT:  Thank you.  You are excused, also."

*     *     *

*Second panel — October 10, 1997*

"THE COURT:  All right.  The defendant in this case, ladies and gentlemen, is Mr. John Leo Capistrano.  I'm not going to tell you too much about this case, for reasons that will be obvious in just a moment.

"I should tell you that Mr. Capistrano is charged with having committed a number of different felony offenses. One of those is the crime of murder in the first degree.

"It is alleged also that because of the manner in which the killing occurred, that special circumstances exist in this case.

"If the jury that is selected in this case returns a verdict of guilty of murder in the first degree, and further finds that the special circumstances are true, the jury will then be called upon to determine the penalty in this case.

"The jury will have two options and two options only. That will be the penalty of life in prison without the possibility of parole, or the penalty of death.

"Now, people do tend to have strong opinions when it comes to the death penalty, and people are certainly entitled to have those opinions, and no such opinion is right or wrong, but we do need to find out what your feeling is in general on the death penalty before we can proceed any further, so I'm going to ask you first the following couple of very general questions.

"The first question is this:

"Because of your feelings about the death penalty in general, is there anyone who would be unable to vote to impose the punishment of death in this case or in any case, regardless of the evidence?

"If the answer is yes, if you'd rise.

"PROSPECTIVE JUROR: Would you say that again?

"THE COURT: Would you be unable to vote to impose the punishment of death in this case or in any case, regardless of the evidence?

"All right. Let's start with the lady in the — I guess that's the second row, in blue.

"Your name, please?

"PROSPECTIVE JUROR [A.W.]: I just don't believe —

35

"THE COURT:  I need your name.

"PROSPECTIVE JUROR [A.W.]:  [A.W.]

"THE COURT:  And Miss [W.], you would be unable to impose the death penalty in this case or any case, regardless of the evidence; is that correct?

"PROSPECTIVE  JUROR [A.W.]:  Yes.

"THE COURT:  You are excused.  Thank you.

"I assume you're making the same objection as before?

"[DEFENSE COUNSEL]:  Yes.

"THE COURT:  Made and overruled.

"And your name in the back?

"PROSPECTIVE JUROR [Y.B.]:  [Y.B.]

"THE COURT:  Miss [B.], you would be unable to vote to impose the death penalty in this case or any case, regardless of the evidence, because of your feeling about the death penalty?

"PROSPECTIVE JUROR [Y.B.]:  Yes.

"THE COURT:  You are excused.  Thank you.

"You are Mr. [N.]?

"PROSPECTIVE JUROR [E.N.]:  That is correct, your Honor.

"THE COURT:  Mr. [N.], you would be unable to vote to impose the death penalty in this case or any case, regardless of the evidence, because of your feelings about the death penalty?

"PROSPECTIVE JUROR [E.N.]:  That is correct.

"THE COURT:  You are excused, as well.

"PROSPECTIVE JUROR [J.S.]:  [J.S.]  [Spells name.]

"THE COURT:  And your answer would be the same, Miss [S.]?

"PROSPECTIVE JUROR [J.S.]:  Yes.

"THE COURT:  You would be unable to impose — vote to impose the death penalty in this case or any case, regardless of the evidence, because of your feelings about the death penalty in general?

"PROSPECTIVE JUROR [J.S.]:  Yes.

"THE COURT:  You are excused, as well.

"In the back row?

"PROSPECTIVE JUROR [M.J.]:  [M.J.]

"THE COURT:  Miss [J.], would your answer be the same?

"PROSPECTIVE JUROR [M.J.]:  Yes, it would.

"THE COURT:  You would be unable to — you would be unwilling, I should say, to vote to impose the death penalty in this case or any case, regardless of the evidence, because of your feelings about the death penalty in general?

"PROSPECTIVE JUROR [M.J.]:  That is correct.

"THE COURT:  You are excused.

"And your name?

"PROSPECTIVE JUROR [L.E.]:  [L.E.]

"THE COURT:  Miss [E.], you would be unwilling to vote to impose the death penalty in this case or any case, regardless of the evidence, because of your feelings about the death penalty, in general?

"PROSPECTIVE JUROR [L.E.]:  Yes, sir.

"THE COURT:  You are excused, as well.  Thank you."

*     *     *

37

*Third panel — October 14, 1997*

"THE COURT:  Ladies and gentlemen, the defendant in this case is accused of having committing [*sic*] a number of different felony offenses.  One such offense is the crime of murder, murder in the first degree.

"If the jury in this case finds the defendant, whose name is John Capistrano, guilty of murder in the first degree, further finds that special circumstances exist, then the jury will have to determine the penalty in this case, and the jury will have two and two options only, and that will be life imprisonment without the possibility of parole or the penalty of death.

"Persons do tend to have strong opinions one way or the other about the death penalty.  There is nothing wrong about having such opinions, but I do need to find out a little bit about those opinions at this time.

"Now, if there are any of you who have such strong feelings about the death penalty law in general that you would be unable to impose the punishment of death in this case or in any case, regardless of the evidence, would you stand, please?

"All right.  Beginning with the gentleman on my left, your name, sir?

"PROSPECTIVE JUROR [J.L.]:  [J.L.], [spells name].

"THE COURT:  All right.  I've found you.

"PROSPECTIVE JUROR [J.L.]:  I am just against the death penalty.

"THE COURT:  Regardless of the circumstances of the case?

"PROSPECTIVE JUROR [J.L.]:  Yes, sir.

"THE COURT:  Regardless of the evidence?

"PROSPECTIVE JUROR [J.L.]:  Yes, sir.

"THE COURT:  There is no possible case that you would vote to impose the death penalty on?

"PROSPECTIVE JUROR [J.L.]:  Yes, sir.

38

"THE COURT:  All right.  Sir, you are excused.  Thank you.

"Ma'am, you stood up a little late, so I'll come back to you.

"Your name?

"PROSPECTIVE JUROR [G.L.]:  [G.L.]

"THE COURT:  Your last name again?

"PROSPECTIVE JUROR [G.L.]:  [Spells name].

"THE COURT:  All right, ma'am.

"PROSPECTIVE JUROR [G.L.]:  I am strongly against the death penalty. I'm against it.

"THE COURT:  In any case?

"PROSPECTIVE JUROR [G.L.]:  In any case.  Life imprisonment, I'm okay; but death, I'm against it.

"THE COURT:  So you would be unable to vote to impose the death penalty in this case or in any case; is that right?

"PROSPECTIVE JUROR [G.L.]:  Yes.

"THE COURT:  Regardless of the evidence?

"PROSPECTIVE JUROR [G.L.]:  Yes, sir.

"THE COURT:  Is that yes?

"PROSPECTIVE JUROR [G.L.]:  Yes, sir.

"[DEFENSE COUNSEL]:  Your Honor, our position would be the same as previously stated.

"THE COURT:  I assumed that.

"All right.  Miss [L.], thank you.

"You are excused, also.

"Your name?

"PROSPECTIVE JUROR [L.W.]:  [L.W.], [spells name].

"THE COURT:  [L.W.], Jr., yes, sir.

39

"PROSPECTIVE JUROR [L.W.]: I'm opposed to it because back in '76 my brother was convicted of murder in the first degree.

"THE COURT: So you would be unable to impose the punishment of death in this case or any case?

"PROSPECTIVE JUROR [L.W.]: Any case, yes, sir.

"THE COURT: Regardless of the evidence or circumstances?

"PROSPECTIVE JUROR [L.W.]: Yes, sir.

"THE COURT: Is that right?

"PROSPECTIVE JUROR [L.W.]: Yes, sir.

"THE COURT: You could not even conceive of an instance where you would vote to impose the death penalty?

"PROSPECTIVE JUROR [L.W.]: No, no, sir.

"THE COURT: Sir, thank you. You are excused.

"Your name, ma'am?

"PROSPECTIVE JUROR [R.C.]: My name is [R.C.].

"THE COURT: [Repeats name]?

"PROSPECTIVE JUROR [R.C.]: Yes. I am against the death penalty.

"THE COURT: So you could not vote to impose the death penalty in this case or in any case?

"PROSPECTIVE JUROR [R.C.]: No, sir.

"THE COURT: Regardless of the evidence?

"PROSPECTIVE JUROR [R.C.]: No, sir.

"THE COURT: Regardless of the circumstances?

"PROSPECTIVE JUROR [R.C.]: No, sir.

"THE COURT: You could not even conceive of a case where you would vote to impose the death penalty?

"PROSPECTIVE JUROR [R.C.]: No, sir.

40

"THE COURT:  You are excused.  Thank you.

"Okay.  Ma'am, in the front row.

"PROSPECTIVE JUROR [N.H.]:  . . . [¶] I'm vegetarian.  I don't even — I went fly fishing in the summer, and a fish died, and I cried, so no, there is no way I could even consider anything like that.

"THE COURT:  Have you given this subject any thought before right now?

"PROSPECTIVE JUROR [N.H.]:  When the fish died, and I cried, it was spontaneous.  I realized then that I can't even enjoy fish, so I don't want to be a part of this.

"THE COURT:  You couldn't conceive of an instance so terrible that you would vote to impose the death penalty?

"PROSPECTIVE JUROR [N.H.]:  No, not at all.

"THE COURT:  So you couldn't vote to impose it in this case or any case?

"PROSPECTIVE JUROR [N.H.]:  Everything has a right to live.

"THE COURT:  Regardless of the evidence?

"PROSPECTIVE JUROR [N.H.]:  Regardless.

"THE COURT:  Under no circumstances?

"PROSPECTIVE JUROR [N.H.]:  No circumstances.

"THE COURT:  You are excused, as well, Miss [H.].  Thank you.

"And your name?

"PROSPECTIVE JUROR [E.S.]:  [E.S.]

"THE COURT:  [G.S.]?

"PROSPECTIVE JUROR [E.S.]:  [E.], [spells first name].

"THE COURT:  Okay, I see.

"PROSPECTIVE JUROR [E.S.]:  I'm against it, so maybe I would be able to voice my opinion on that.

"THE COURT: You couldn't conceive of any instance where you would vote to impose the death penalty?

"PROSPECTIVE JUROR [E.S.]: I don't think so.

"THE COURT: No crime could be horrible enough for you to do that?

"PROSPECTIVE JUROR [E.S.]: I don't think so. I just — I guess because of my religion, that let everything have that have breath praise the Lord, and I'm just against it.

"THE COURT: I'm having a hard time hearing you. Because of your religion?

"PROSPECTIVE JUROR [E.S.]: I said everything that has breath praise the Lord, and I — I just couldn't be the one to say yes.

"THE COURT: So you could not vote to impose that penalty in this case or any case?

"PROSPECTIVE JUROR [E.S.]: No.

"THE COURT: Regardless of the evidence?

"PROSPECTIVE JUROR [E.S.]: No.

"THE COURT: Regardless of the circumstances?

"PROSPECTIVE JUROR [E.S.]: No.

"THE COURT: You couldn't even conceive of a case where you would think that a death penalty would be appropriate?

"PROSPECTIVE JUROR [E.S.]: No, not for murder, no.

"THE COURT: Is there some other crime that you would think would be appropriate?

"PROSPECTIVE JUROR [E.S.]: Might be a possibility, but not murder, no.

"THE COURT: What crime would you think would be appropriate?

42

"PROSPECTIVE JUROR [E.S.]:  In my case, maybe like a misdemeanor or something like that, something that's not real bad.

"THE COURT:  So you think that the death penalty would be appropriate for some lesser crime?

"PROSPECTIVE JUROR [E.S.]:  Uh-huh, death penalty, yes.

"THE COURT:  I think we'll have to talk to you some more, so have a seat, sit down."

\*     \*     \*

*Fourth panel — October 14, 1997*

"THE COURT:  All right.  Ladies and gentlemen, I'm not going to tell you very much about this case, because in order for you to answer the first series of questions concerning your qualifications to serve as jurors, you don't need to know anything about the case, other than to tell you that the defendant in this case, Mr. John Capistrano, is facing a number of felony charges in this case.

"One of them is the charge of murder in the first degree.

"Now, if the jury in this case returns a verdict of guilty of murder in the first degree, and further finds that the special circumstances that are alleged against Mr. Capistrano are true, there will then be a penalty phase in this case, in which the jury will be asked to determine the punishment.

"The jury will have two options and two options alone:  life without the possibility of parole, life in prison, that is, without the possibility of parole, or death, so this is a death penalty case.

"Now, there are persons who have strong feelings about the death penalty in the State of California, and there is nothing wrong with having such opinions, but I need to know what those opinions are.

43

"So I'll ask you first if any of you have such strong feelings about the death penalty that you would be unable to vote to impose the punishment of death in this case or in any other case, regardless of the evidence or the circumstances?

"If your answer to that is yes, if you would stand.

"All right.  Let's start with you, sir.

"PROSPECTIVE JUROR [E.B.]:  [E.B.]

"THE COURT:  Yes, sir?

"PROSPECTIVE JUROR [E.B.]:  I could not participate in a jury that would be asked to impose death in any case.

"THE COURT:  So you could not conceive of a case where the death penalty might be appropriate?

"PROSPECTIVE JUROR [E.B.]:  I could conceive — I could conceive of a case, but I don't know that I'd want — I — I don't know that I would want to be part of that case.

"THE COURT:  Well, I think we're going to need to ask you some more questions about that.

"Have a seat.

"Your name?

"PROSPECTIVE JUROR [A.M.]:  [A.M.]

"THE COURT:  What was your name again?

"PROSPECTIVE JUROR [A.M.]:  [Repeats name.]

"THE COURT:  Yes, there you are.  I'm sorry.

"PROSPECTIVE JUROR [A.M.]:  I can conceive of someone doing something wrong where people would consider that he deserved death.  I don't — I'm against the death penalty.

"THE COURT:  In general?

"PROSPECTIVE JUROR [A.M.]:  Flat out.

44

"THE COURT:  So you could not conceive of a case where the death penalty might be warranted?

"PROSPECTIVE JUROR [A.M.]:  My heart is racing just thinking about deciding to make that judgment.

"THE COURT:  So are you indicating to me then that you could not vote to impose the death penalty in this case or in any other case, regardless of the evidence or circumstances?

"PROSPECTIVE JUROR [A.M.]:  No.

"Life imprisonment without the possibility of parole; death, no.

"THE COURT:  So your answer to my question is you could not vote to do that?

"PROSPECTIVE JUROR [A.M.]:  I could not vote for the death penalty.

"THE COURT:  Under any circumstances?

"PROSPECTIVE JUROR [A.M.]:  Under any circumstances.

"THE COURT:  Appreciate your letting me know that, Miss [M.].  You are excused.  Thank you.

"Your name, ma'am?

"PROSPECTIVE JUROR [L.T.]:  [L.T.]

"THE COURT:  Yes.

"PROSPECTIVE JUROR [L.T.]:  I would not like to be the one to decide on taking a person's life.

"THE COURT:  Well, you wouldn't be the only one.  It would be twelve jurors who would have to agree.

"PROSPECTIVE JUROR [L.T.]:  I —

"THE COURT:  So you would not want to participate?

"PROSPECTIVE JUROR [L.T.]:  No.

45

"THE COURT:  Could you conceive of a case that would be so horrendous that you would vote to impose the death penalty?

"PROSPECTIVE JUROR [L.T.]:  Yes.

"THE COURT:  So depending on the circumstances or the evidence, you might be willing to vote to impose it?

"PROSPECTIVE JUROR [L.T.]:  Yes.

"THE COURT:  Okay.  Have a seat."

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Capistrano

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S067394
**Date Filed:** August 4, 2014

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Andrew C. Kauffman


_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Kathleen M. Scheidel, Assistant State Public Defender, for Defendant and Appellant.

Edmund G. Brown and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey, Joseph P. Lee and Margaret E. Maxwell, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Kathleen M. Scheidel
Assistant State Public Defender
221 Main Street, Suite 1000
San Francisco, CA 94105
(415) 904-5600

Margaret E. Maxwell
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 897-2282

2